**REESE RICHMAN LLP**
Michael R. Reese
Kim E. Richman
Belinda L. Williams
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Telephone (212) 643-0500
Facsimile: (212) 253-4272

*Counsel for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT IOWA

| | |
|---|---|
| GREGORY YOUNG ODETTA YOUNG; EDWARD HUYER and CONNIE HUYER on behalf of themselves and all others similarly situated | ) ) ) ) Case No. 4:08-CV-507 |
| | ) |
| | ) **SECOND AMENDED** |
| | ) **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| WELLS FARGO & CO, and WELLS FARGO BANK, N.A. | ) ) |
| | ) |
| Defendants. | ) |
| | ) <u>DEMAND FOR JURY TRIAL</u> |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Plaintiffs Gregory Young, Odetta Young, Edward Huyer, and Connie Huyer (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, file this second amended complaint pursuant to order of the Hon. Magistrate Celeste F. Bremer at the status conference on December 8, 2009 ("December 8th Order"). Pursuant to the December 8th Order, this second amended complaint is filed only for ministerial purposes to comply with this Court's October 27, 2009 order denying in part defendant's motion to dismiss (Dkt 89) ("October 27th Order"). Pursuant to the December 8th Order, the amendments to the complaint that constitute this Second Amended Complaint cannot serve as grounds for Defendants to file another motion to dismiss. Accordingly, Plaintiffs allege as follows:

<u>NATURE OF THE CASE</u>

1.     This class action seeks to put an end to the equivalent of price-gouging by Wells Fargo & Co. and Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendants") at the expense of vulnerable homeowners.     Specifically, as set forth more fully below, Defendants engaged in a fraudulent scheme in violation of federal and state law, assisted by a nationwide web of outside vendors who acted in concert with Defendants to perpetrate the scheme, to exact improper inspection fees and late charges from homeowners who had fallen into arrears on their mortgages.

2.     These additional costs, which this action seeks to recover, placed Plaintiffs and other borrowers whose mortgages were serviced by Wells Fargo in difficult financial straits, putting their homes in jeopardy and, in some instances, resulting in bankruptcy. *See e.g. In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) ("*Stewart*") (stating that Wells Fargo's bogus fees and other misconduct forced homeowner into bankruptcy). Plaintiffs now seek return of these inflated, bogus inspection costs and late fees.

3.     In particular, Defendants utilized a computer system to automatically assess fees for late payments and property inspections without regard to the terms of the borrowers' mortgage loans or the relevant circumstances. Instead of being based upon reasonable parameters, the computer system was programmed to assess as many charges as possible and to pay first all outstanding fees and costs before satisfying interest and principal. Further, Defendants concealed the nature of the fees being assessed on monthly statements mailed to Plaintiffs and Class members by describing

them simply as "other" charges.  In this manner, Defendants victimized and further increased the indebtedness of persons who were already in danger of losing their homes to foreclosure. Defendants' scheme has been ongoing for years and was in existence when Plaintiffs and Class members obtained their mortgages.

4.    Defendants' misconduct has not gone unnoticed.   Recently, the United States Bankruptcy Court for the Eastern District of Louisiana issued an opinion sanctioning Wells Fargo for its unlawful conduct at issue here.  *See In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) ("*Stewart*").

5.    In the *Stewart* case, the court found that Wells Fargo's unlawful, automated practice of charging fees to distressed borrowers had resulted in the assessment of multiple late fees for a single missed payment as well as assessment of an inspection fee on average once every month and a half over a seven year period, deepening the debtor's default although the borrower's property always had been occupied and in good condition.  Moreover, the inspections generated by Defendants' automated system were never read or reviewed by any Wells Fargo employee, further demonstrating that the inspections were simply a profit generating mechanism and were not necessary to safeguard the lender's interests.

6.    As held by the Honorable Elizabeth W. Magner in the Wells Fargo foreclosure matter at issue in *Stewart*:

> The Court concludes…that Wells Fargo has a corporate practice that fails to notify borrowers that fees, costs, or charges are being assessed against their accounts.

> * * *

> Wells Fargo's [conduct is] abusive behavior…in particular, the abusive imposition of unwarranted fees and charges (late fees and inspection costs).

*Id.* at 342.

7.    In addition, the Senate Judiciary Subcommittee on Administrative Oversight and the Courts recently convened hearings to consider allegations that mortgage lenders and mortgage servicing companies, including Defendants, have deepened the foreclosure crisis and improperly

CLASS ACTION COMPLAINT

used the bankruptcy system to collect unwarranted and unreasonable fees. In his opening statement, Senator Charles E. Schumer aptly observed that, as a result of these unlawful practices, vulnerable homeowners trying desperately to stay afloat are instead suffering a "death by a thousand fees."

8.    Defendants have profited enormously from this fraudulent scheme. As the *Stewart* court observed, Wells Fargo's assessment of late and inspection fees on home mortgage loans it services generates hundreds of millions of dollars in revenues for Wells Fargo.

9.    Plaintiffs have brought this action to put an end to Defendants' scheme and to recover the improper, unwarranted and unreasonable fees charged to and paid by Plaintiffs and Class members.

10.    As alleged below in detail, Defendants' misconduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* (Counts I) and California's states consumer protection law (II).

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962 and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §15. This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§1965(b) and (d). Diversity jurisdiction is also conferred over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, § 7, 119 Stat. 13 ("CAFA"). Wells Fargo Home Mortgage, the mortgage servicing division of Wells Fargo, is headquartered in Iowa. It is appropriate to apply the California UCL to protect a nationwide class because the wrongdoing alleged herein occurred in significant part in California, and Defendant Wells Fargo & Co. has its principal place of business within the state of California.

12.    Defendants concede that venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §1391(b), 15 U.S.C. §22, and 28 U.S.C. §1391 because Wells Fargo Home Mortgage, the mortgage servicing division of Wells Fargo, is found, does business and transacts business within this district, and Defendants conduct the interstate trade and commerce described below in substantial part within this district.

13.     During all or part of the period in which the events described in this Complaint occurred, each of the Defendants participated in a scheme to defraud Plaintiffs and other members of the Class in a continuous and uninterrupted flow of interstate commerce.

14.     The activities of Defendants were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

15.     Plaintiffs Gregory Young and Odetta Young ("the Youngs") are a married couple with children who reside in Hillsborough, New Jersey.

16.     Plaintiffs Edward Huyer and Connie Huyer ("the Huyers") are a married couple who reside in Florence, South Carolina.

17.     Defendant Wells Fargo & Co. is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking and consumer finance through banking stores, the internet and other distribution channels to customers, businesses and other institutions in all 50 states and in other countries.  Wells Fargo & Co. is the parent corporation of Defendant Wells Fargo Bank, N.A. Wells Fargo & Co. exercises specific and financial control over the operations of Defendant Wells Fargo Bank, N.A., dictates the policies and practices of Wells Fargo Bank, N.A., exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein. Wells Fargo & Co. represents on its website at https://www.wellsfargo.com/ jumpmortgageprinciples that it controls and sets the standard for its loan servicing business stating that:

Wells Fargo & Company Responsible Servicing Principles for U.S. Residential Real Estate Lending…Well's Fargo's vision to satisfy all our customers' financial needs...Similarly, we have long adhered to [] responsible servicing practices…

18.     Defendant Wells Fargo Bank, N.A., is a subsidiary of Wells Fargo & Co.  Wells Fargo Bank, N.A. is a national association that is headquartered in South Dakota.  Wells Fargo Bank, N.A. conducts mortgage servicing operations through its Wells Fargo Home Mortgage division which is headquartered in Des Moines, Iowa.  During the Class Period, the Plaintiffs'

CLASS ACTION COMPLAINT

mortgages were serviced by Wells Fargo Bank, N.A., through its mortgage servicing division—Wells Fargo Home Mortgage.

## FACTUAL ALLEGATIONS

19.    Every home mortgage contains provisions specifying when payments are due and when they are considered late, and providing that only reasonable fees may be assessed if payments are not timely.

20.    Plaintiffs' notes are typical in this regard.  As set forth in more detail below, the Plaintiffs' mortgage payments were due the first of each month and were considered late if they were not received by Wells Fargo by the end of fifteen calendar days after the date they were due.  In the event of a late payment, the Plaintiffs' notes provided that a single late charge in the amount of 5% of the overdue payment would be assessed.  The Plaintiffs' mortgages further permitted Wells Fargo or its agents to do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property.  Upon information and belief, in these respects, Plaintiffs' notes were substantially identical to the note of the debtor in the *Stewart* case.

21.    The vast majority of borrowers make their monthly mortgage payments to mortgage servicing companies such as Wells Fargo rather than their original lender or the current holder of the mortgage note.  Wells Fargo services 10.3 million residential mortgage customers or 1 out of 7 mortgages in America, making it the second largest home mortgage servicer in the United States.

22.    As part of its mortgage servicing operations, Wells Fargo collects monthly payments from borrowers consisting of principal and interest, taxes and insurance, and other fees and charges that may have been assessed and disburses these payments to the appropriate parties such as lenders, investors, taxing authorities, insurers, and other relevant persons.

23.    Wells Fargo earns revenue from mortgage loan servicing in three ways.  First, Wells Fargo receives a fixed fee for each loan which is determined by the servicing agreements between Wells Fargo and the investors or note holders.  Second, Wells Fargo earns "float" income from accrued interest between when consumers pay and when those funds are remitted

CLASS ACTION COMPLAINT

to lenders, investors, taxing authorities, insurers, and other relevant parties. Third, Wells Fargo retains all, or part, of certain fees such as late charges that consumers pay.

24.     Because Wells Fargo earns "float" income on funds held and retains all or part of certain fees that borrowers must pay, Wells Fargo has an incentive to impose additional fees on consumers.

25.     Since at least 2001, Wells Fargo has managed and administered its residential mortgage servicing tasks through the use of general computer software packages with little or no human intervention.

26.     Entries on home loan accounts serviced by Wells Fargo are tracked with a licensed computer software platform known as Fidelity Mortgage Servicing Package (also known as "Fidelity MSP"). When Wells Fargo receives a payment for a mortgage loan account from a borrower, that payment is entered into the Fidelity MSP software and the payment is deposited. Fidelity MSP then applies the payment to the borrower's account.

27.     Fidelity MSP will apply computer logic to certain events, triggering automatic action on the loan file. More particularly, guidelines for the management of loans serviced by Wells Fargo – *e.g.*, when late fees are due – are imported into Fidelity MSP's internal logic and automatically applied. Other charges and fees, such as fees for property inspections, are assessed against the account by virtue of "wrap around" software packages maintained by Wells Fargo. These software packages interface with Fidelity MSP and also implement decisions on the loan file based on internal computer logic.

28.     If a borrower is late making a payment, Wells Fargo's computer system will automatically order a property inspection and charge the borrower's account for this inspection after the loan has been in default for a certain number of days regardless of whether there is a reasonable need for an inspection. In most cases, the computer system will automatically recommend a property inspection if the borrower has been in default for between 20 to 45 days.

29.     Wells Fargo's computer system automatically generates work orders for property inspections without human intervention. No person or employee of Wells Fargo is involved in

CLASS ACTION COMPLAINT

the determination of whether a property inspection is reasonably necessary to protect the lender's interest in the property.

30.    The Fidelity MSP system transmits property inspection work orders to one of at least three approved vendors with which Wells Fargo has an agreement.  These vendors include First American Real Estate Information Services, Inc., Fidelity National Financial, Inc., and Mortgage Contracting Services, LLC.

31.    Once the approved vendor receives the computer generated work order, the inspection is performed and the cost is charged to the borrower's account.

32.    The vendor uploads a finished property inspection report directly into Wells Fargo's computer mainframe.  Therefore, the computer system, rather than any person, checks the condition of the property and alerts Wells Fargo if a property is at risk.

33.    After the first property inspection is "triggered" by a default, the Wells Fargo computer system will continue to order property inspections every 20 to 45 days until the borrower cures the default.  For example, if a borrower misses one month's periodic payment, but continues to consistently make monthly periodic payments thereafter, he or she is considered by Wells Fargo to be in default on the loan until the initial default is cured. Therefore, although a borrower continues to make regular periodic payments after having only missed one month's payment, the Wells Fargo computer system will continue to automatically generate work orders for property inspections until the initial default is cured.

34.    Further, because the property inspections are ordered based on a computer program rather than human decision-making, property inspections may be performed on a borrower's property regardless of the fact that the property has already been inspected numerous times and was previously deemed occupied, well-maintained and in good condition.

35.    Wells Fargo's practices with respect to property inspections are in stark contrast to the Federal Housing Administration's guidelines for property inspections on homes that are federally insured.  FHA guidelines provide that a mortgage servicer should perform and can be reimbursed for one (1) initial property inspection that should be conducted if a mortgagor's payment is not received within 45 days of the due date and efforts to reach the borrower by telephone are unsuccessful.  If

CLASS ACTION COMPLAINT

the initial property inspection reveals that the property is occupied or if occupancy is confirmed through another method (i.e., the borrower makes a payment or contact is made by telephone), FHA guidelines state that the mortgage servicer will not be reimbursed for any additional inspections and additional inspections are not required. Wells Fargo, in contrast, allows property inspections to be conduct every 20 to 45 days until a borrower cures a default regardless of whether the previous inspection revealed that the house was occupied and well maintained, regardless of whether Wells Fargo has made contact with the borrower through telephone or other means, and regardless of whether the borrower continues to make payments.

36.    Wells Fargo regularly conducted its mortgage servicing operations by designing, operating and managing the Fidelity MSP computer software to intentionally charge borrowers unreasonable, improper and unlawful fees.

37.    The Fidelity MSP system is not tied to the Plaintiffs' or Class members' mortgage agreements, but was designed and operated in a centralized fashion to defraud thousands of borrowers that had their mortgages serviced by Wells Fargo.

38.    As the United States Bankruptcy Court for the Eastern District of Louisiana held in *Stewart*, Wells Fargo's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default - and to continuously order those inspections thereafter until the default is cured - is neither reasonable nor appropriate as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting Wells Fargo's bottom line.

39.    That these computer-generated inspections are unreasonable, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for Wells Fargo is further evidenced by the limited nature of the inspections themselves. The property inspections ordered by the Wells Fargo computer system are mere "drive-by" inspections, *i.e.*, the inspector "drives by" the property ostensibly to assess whether the house is occupied, being maintained, and has not been damaged – a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk. Indeed, Wells Fargo personnel do not read the

CLASS ACTION COMPLAINT

inspection reports. Rather, electronic files of property inspections are stored in the Property Management Department of Wells Fargo but are never read by anyone at Wells Fargo. As a result, the observations contained in the initial inspection have absolutely no bearing on whether another inspection will be ordered in 20 or 45 days.

40.     As part of its scheme to generate fees, Wells Fargo repeatedly sent to Plaintiffs and Class members materially false and misleading agreements, contracts and monthly mortgage statements by mail and wire. Wells Fargo's scheme was also designed to conceal its existence. Specifically, Wells Fargo conceals the nature of the improper and unlawful inspection fees from borrowers by listing them on the borrower's statement only as "other charges."

### The Named Plaintiffs Have Been Victimized by Defendants' Scheme

#### Gregory and Odetta Young

41.     On August 26, 2005, the Youngs purchased a new home located in Hillsborough, New Jersey and entered into a mortgage agreement with Wells Fargo Bank, N.A. to borrow money for the purchase of the home.

42.     The Youngs' mortgage agreement permits Wells Fargo or its agents to do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property.

43.     The Youngs' mortgage was serviced by Defendant Wells Fargo Bank, N.A. through its mortgage servicing division, Wells Fargo Home Mortgage.

44.     Each month, the Youngs received a monthly mortgage statement through the U.S. mail reflecting the amount of the current payment due on their mortgage and the amount of any payment remitted by the Youngs and received by Wells Fargo since the prior month's statement.

45.     Over the life of the loan, the Youngs occasionally faced difficulty in making timely payments on their mortgage. During these times, the Youngs continued to consistently make monthly payments in an effort to cure their default; yet the monthly statements received by the Youngs after missing a payment reflected additional amounts owed in fees that were unlawfully assessed by Wells Fargo pursuant to the fraudulent scheme alleged herein.

CLASS ACTION COMPLAINT

46.    In this regard, the Youngs were charged fees for property inspections when their loan was approximately 30 days past due, and Wells Fargo continued to order property inspections on their home thereafter even though the Youngs continued to make payments every month and continuously occupied the home.

47.    For example, the Youngs owed Wells Fargo a monthly periodic payment of $3131.57 that was due on October 1, 2006.  The Youngs were unable to make this payment until October 31, 2006.  A mortgage statement dated October 31, 2006 reflects that the Youngs were charged a $45.00 fee identified only as "other charges" on the statement.   Upon information and belief this $45.00 unidentified charge was for a drive-by property inspection of the Youngs' property.

48.    Other monthly statements received by the Youngs reflecting the assessment of "other charges" include the following:

   a.    A mortgage statement dated November 20, 2006 reflected "other charges" of $15.00.

   b.    A mortgage statement dated November 30, 2006 reflected "other charges" of $15.00.

   c.    A mortgage statement dated January 16, 2007 reflected "other charges" of $47.50.

   d.    A mortgage statement dated September 20, 2007 reflected "other charges" of $15.00.

   e.    A mortgage statement dated October 18, 2007 reflected "other charges" of $15.00.

   f.    A mortgage statement dated February 19, 2008 reflected "other charges" of $15.00.

   g.    A mortgage statement dated March 31, 2008 reflected "other charges" of $15.00.

   h.    A mortgage statement dated April 18, 2008 reflected "other charges" of $15.00.

CLASS ACTION COMPLAINT

      i.   A mortgage statement dated April 30, 2008 reflected "other charges" of $15.00.

49.   Upon information and belief, the "other charges" reflected in the forgoing monthly mortgage statements received by the Youngs were for unreasonable and unnecessary computer-generated drive-by property inspections.

50.   Since the Youngs continued to make monthly payments even when they fell behind and continuously occupied their home, these inspections were not necessary to protect the lender's interest in the property and were merely conducted in order to generate additional fees and more float income for Wells Fargo.

51.   In addition, after the Youngs missed a payment, they were also continuously charged excessive late fees in the months following the missed payment regardless of the fact that the Youngs continued to make payments every month after the missed payment.

52.   Monthly statements received by the Youngs reflecting the assessment of wrongfully charged late fees include:

      a.   A mortgage statement dated November 30, 2007, reflected "unpaid late charge(s)" of $117.34.

      b.   A mortgage statement dated October 18, 2007, reflected "unpaid late charge(s)" of $292.13.

      c.   A mortgage statement dated February 19, 2008, reflected "unpaid late charge(s)" of $816.53.

      d.   A mortgage statement dated March 31, 2008, reflected "unpaid late charge(s)" of $816.53.

      e.   A mortgage statement dated April 18, 2008 reflected "unpaid late charge(s)" of $972.17.

      f.   A mortgage statement dated April 30, 2008 reflected "unpaid late charge(s)" of $972.17.

<u>Edward and Connie Huyer</u>

53.    On March 16, 2007, the Huyers purchased a new home located in Florence, South Carolina, and entered into a mortgage agreement with Wells Fargo Bank, N.A. to borrow money for the purchase of the home.  Also on March 16, 2007, the Huyers and Star Funding, LLC entered into a second mortgage agreement for the same property and Star Mortgage Services had the servicing rights for that mortgage. However, on that same day, Star Mortgage Services assigned, sold or transferred the servicing rights for the second mortgage to Wells Fargo.

54.    The Huyers' mortgage agreement with Wells Fargo permits Wells Fargo or its agents to do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the Property.

55.    Both the Huyers' first and second mortgage loans were serviced by Defendant Wells Fargo Bank, N.A. through its mortgage servicing division, Wells Fargo Home Mortgage.

56.    Each month, the Huyers received a monthly mortgage statement for both loans through the U.S. mail reflecting the amount of the current payment due and the amount of any payment remitted by the Huyers and received by Wells Fargo since the prior month's statement.

57.    Over the life of the loans, the Huyers occasionally faced difficulty making timely payments on their loans.  During these times, the Huyers continued to consistently make monthly payments in an effort to cure their default, yet the monthly statements received by the Huyers after missing a payment reflected additional amounts owed in fees that were unlawfully assessed by Wells Fargo pursuant to the fraudulent scheme alleged herein.

58.    In fact, the Huyers were charged fees for property inspections when their loan was less than 20 days past due, and Wells Fargo continued to order property inspections on their home even though the Huyers continued to make payments every month and continuously occupied their home.

59.    For example, in 2007, the Huyers owed Wells Fargo a monthly periodic payment for the month of July of $1938.33 for their first mortgage loan. If that amount was not paid by July 16, 2007, the Huyers would be charged an $85.00 late fee.  The Huyers were unable to

make this payment by July 16, 2007. A mortgage statement from Wells Fargo dated July 19, 2007 reflects that the Huyers were charged a late fee and an unidentified "other charges" fee in the amount of $10.00 on July 16, 2007, only sixteen days after the payment was due. Upon information and belief this $10.00 unidentified charge was for a drive-by property inspection of the Huyers' property.

60.     Every time the Huyers fell behind on their loan payments for their first and second mortgages, they continued to make payments, and the Huyers even contacted Wells Fargo to set up a forbearance agreement that would allow them catch up on their payments over a period of months. On or about August 30, 2007, the Huyers entered into a "temporary forbearance agreement" with Wells Fargo for both their first and second mortgages. However, Wells Fargo continued to assess unlawful fees as reflected in the following monthly mortgage statements:

     a.    A mortgage statement dated July 19, 2007 for the Huyers' first mortgage reflected "other charges" of $10.00.

     b.    A mortgage statement for the Huyers' second mortgage dated July 19, 2007 reflected "other charges" of $24.57.

     c.    A mortgage statement dated August 21, 2007 for the Huyers' first mortgage reflected "other charges" of $10.00.

     d.    A mortgage statement for the Huyers' second mortgage dated August 21, 2007 reflected "other charges" of $24.57.

     e.    A mortgage statement dated September 7, 2007 for the Huyers' first mortgage reflected "other charges" of $25.00.

     f.    A mortgage statement for the Huyers' second mortgage dated September 7, 2007 reflected "other charges" of $24.57.

61.     Upon information and belief, the "other charges" reflected in foregoing monthly first and second mortgage statements received by the Huyers were charges for unreasonable and unnecessary computer-generated drive-by property inspections. Indeed, as the foregoing makes clear, in each instance, ***Wells Fargo charged the Huyers two property inspection fees for two***

*separate inspections apparently on the same day on the exact same property because they were behind on both their first and second mortgage*.

62.    Since the Huyers continued to make monthly payments even when they fell behind and continuously occupied their home, these inspections were not necessary to protect the lender's interest in the property and were merely conducted to generate additional fees and more float income for Wells Fargo.  Indeed, the fact that Wells Fargo charged the Huyers two times in the same month for two separate inspections on the same property demonstrates that these inspections served no legitimate purpose.

63.    In addition, after the Huyers missed payments on their first and second mortgages, they were also continuously charged excessive late fees in the months following the missed payment regardless of the fact that the Huyers continued to make payments every month after the missed payment.

64.    Monthly statements received by the Huyers reflecting the assessment of wrongfully charged late fees include:

      a.    A mortgage statement for the Huyers first mortgage dated August 21, 2007, reflected "unpaid late charge(s)" of $171.10.

      b.    A mortgage statement for the Huyers first mortgage dated September 7, 2007, reflected "unpaid late charge(s)" of $171.10.

      c.    A mortgage statement for the Huyers second mortgage dated July 19, 2007 reflected "unpaid late charge(s)" of $14.00.

      d.    A mortgage statement for the Huyers second mortgage dated August 21, 2007, reflected "unpaid late charge(s)" of $28.00.

      e.    A mortgage statement for the Huyers second mortgage dated September 7, 2007, reflected "unpaid late charge(s)" of $28.00.

## RICO ALLEGATIONS

## THE ENTERPRISE

65.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

66.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise": (1) Wells Fargo, and (2) vendors, including First American Real Estate Information Services, Inc., Fidelity National Financial, Inc., and Mortgage Contracting Services, LLC, which conducted the property inspections billed to Plaintiffs and Class members complained of herein.

67.    The Wells Fargo Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

68.    The members of the Wells Fargo Enterprise function as a continuing unit and share the common purpose of maximizing their profits by charging Plaintiffs and Class members improper fees.

69.    The Wells Fargo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendant Wells Fargo and the vendors that perform property inspections. Defendants' Fidelity MSP computer system is a common communication network by which Wells Fargo and these vendors share information.  This common communication network allowed Defendants to charge Plaintiffs and Class members improper fees and to exchange the resulting profits.

70.    While all Defendants participate in and are members and part of the Wells Fargo Enterprise, they also have an existence separate and distinct from the enterprise.

71.    Defendants control, operate, and direct the affairs of the Wells Fargo Enterprise by, among other things, programming their computer system to automatically generate work orders for improper property inspections that instruct vendors to conduct inspections; sending out vendors to inspect the property; arranging for vendors to upload completed electronic reports of the property inspections directly into the automated system; assessing fees to borrowers for property inspections on monthly mortgage statements; concealing the nature of the property inspection fees on monthly mortgage statements; collecting payments from borrowers that include inspection fees; and paying vendors for each property inspection completed using funds received from borrowers.

72.    The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

CLASS ACTION COMPLAINT

## PREDICATE ACTS

73.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

## VIOLATIONS OF 18 U.S.C. § 1341 and 18 U.S.C. § 1343

74.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, monthly mortgage statements, correspondence, checks, and inspection reports.

75.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to agreements, monthly mortgage statements, correspondence, wire transfers, and inspection reports, and made or caused to be made false statements over the telephone, facsimile, electronic mail, and internet.

76.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, *inter alia:*  agreements, monthly mortgage statements, correspondence, payments and inspection reports.

77.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants included information or communications in furtherance of or necessary to effectuate the scheme.

78.    The monthly mortgage statement received by Plaintiffs and Class members detail the amounts due on their loans.  By issuing mortgage statements to Plaintiffs and Class members, Wells Fargo represented to the Plaintiffs and Class members that all amounts due on these statements were

- 16 -

lawful and appropriate charges. Therefore, Defendants misrepresented to Plaintiffs' and Class members in their monthly mortgage statements that all fees, charges and amounts due were lawful and proper. Defendants also concealed improper inspection fees as "other charges" on Plaintiffs' and Class members' mortgage statements. Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the members of the Class and obtaining their property for Defendants' gain.

79.     Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' uses of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

80.     Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the Class relied upon the misrepresentations and omissions. Had the Plaintiffs and Class members known the truth that these improper charges and inspection fees were a profit center for Wells Fargo rather than a mechanism to protect any interest in the property, they would not have paid the improper charges.

81.     As a result, Defendants have obtained money and property belonging to the Plaintiffs and Class members, and Plaintiffs and the Class members have been injured in their business or property by the Defendants' overt acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

82.     The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing o at least two acts of racketeering activity, *i.e.,* indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years. In fact, each of the Defendants has committed thousands of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and Class members.

CLASS ACTION COMPLAINT

83.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## RICO VIOLATIONS

84.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …"

85.    Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the Wells Fargo Enterprise.

86.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Wells Fargo Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## CLASS ACTION ALLEGATIONS

87.    Plaintiffs bring this action on their own behalf of a nationwide class defined as all persons who were charged computer-generated fees by Wells Fargo as a result of a late payment of their mortgage under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

88.    Excluded from the Class are Defendants, any entity in which a Defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by a Defendant, and any Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns.

89.    Plaintiffs do not know the exact sizes or identities of the individuals included in the proposed Class since such information is in the exclusive control of Defendants. Plaintiffs believe that the proposed Class encompasses many thousands or tens of thousands of individuals who are geographically dispersed throughout the United States. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

CLASS ACTION COMPLAINT

90.    All members of the Class have been subject to and affected by the same practices and policies described herein.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

  a. The nature, scope and operations of Defendants' wrongful policies;

  b. Whether Defendants have engaged in mail and wire fraud;

  c. Whether Defendants engaged in a pattern of racketeering activity;

  d. Whether the Wells Fargo Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4);

  e. Whether Defendants conducted or participated in the affairs of the Wells Fargo Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

  f. Whether Wells Fargo had a policy and practice of  fraudulently charging persons in arrears unlawful and unreasonable inspection fees;

  g. Whether the Court can enter declaratory and injunctive relief; and

  h. The proper measure of damages.

91.    The claims of the named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same wrongful policies and practices by Defendants.

92.    The individually named Plaintiffs will fairly and adequately represent the interests of the proposed Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in Class actions.

93.    The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

94.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which

CLASS ACTION COMPLAINT

would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the plaintiff Class.

95.    The Defendants have acted or refused to act on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.

96.    The questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

97.    Notice to the proposed Class can be achieved through the U.S. mail to the addresses of the Class members that are kept within Defendants' records. Notice can also be supplemented via publication.

98.    A Class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

      a.    Individual claims by the Class members are impractical as the costs of pursuit far exceed what any one individual Plaintiff has at stake.

      b.    As a result, individual members of the Class have no interest in prosecuting and controlling separate actions.

      c.    It is desirable to concentrate litigation of the claims herein in this forum.

      d.    The proposed Class action is manageable.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF RICO 18 U.S.C. § 1962(c)

99.    Plaintiffs incorporate and reallege the paragraphs above as if fully set out herein.

100.    This claim for relief arises under 18 U.S.C. § 1964(c).

101.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Wells Fargo Enterprise through a pattern of racketeering.

- 20 -

CLASS ACTION COMPLAINT

102. As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property by both the predicate acts which make up the Defendants' patterns of racketeering activity.

103. Specifically, Plaintiffs and Class members have been injured in their business or property in a variety of ways, including paying unlawful and unreasonable inspection and late fees.

## COUNT II

### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *ET SEQ.*

104. Plaintiffs incorporate and reallege the paragraphs above as if fully set out herein.

105. As set forth above, Defendants' scheme included making false and misleading representations to Plaintiffs and other members of the Class of borrowers, which constitutes unlawful, unfair and fraudulent business practices under the UCL.

106. Specifically, Plaintiffs and the Class members have been injured in their business or property by paying for repeated drive-by inspections and improper late fees, which were unlawful and unreasonable.

107. Plaintiffs' claims involve questions of common and general interest.

108. Plaintiffs and the Class members have suffered losses of money as a result of Defendants' unlawful, deceptive and unfair business practices through the payment of fees. As a result of Defendants' violations of the UCL, Plaintiffs and members of the Class named in this Count are entitled to bring this claim for disgorgement and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

a. Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

b. A declaration that Defendants have committed the violations alleged herein;

CLASS ACTION COMPLAINT

c.  An award of treble the amount of damages suffered by Plaintiffs and members of the Class as proven at trial plus interest and attorneys' fees and expenses pursuant to 18 U.S.C. §1962(c) and (d);

d.  An award of damages suffered by Plaintiffs and Class members pursuant to the provisions of California's consumers protection law identified above;

e.  Ordering Defendants to disgorge the payments and profits they wrongfully obtained at the expense of Plaintiffs and Class members;

f.  Ordering that an accounting be made by Defendants of their wrongfully obtained payments and profits;

g.  An injunction prevent Defendants from engaging in future fraudulent practices;

h.  Costs of this action, including reasonable attorneys fees and expenses; and

i.  Any such other further legal or equitable relief that this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  December 14, 2009          Respectfully submitted,

**REESE RICHMAN LLP**
*/s/ Michael R. Reese*
Michael R. Reese
Kim E. Richman
Belinda L. Williams
875 Sixth Avenue, 18th Floor
New York, New York 10001
*Counsel for Plaintiffs and the Proposed Class*

**ROXANNE CONLIN & ASSOCIATES, P.C.**
Roxanne Conlin
319 Seventh Street, Suite 600
Des Moines, Iowa 50309
Telephone:  (515) 283-1111
Facsimile:   (515) 282-0477

*Local Counsel for Plaintiffs*

CLASS ACTION COMPLAINT

**WHATLEY DRAKE**
  **& KALLAS, LLC**
Deborah Clark-Weintraub
1540 Broadway, 37th Floor
New York, New York  10036
Telephone:  (212) 447-7070
Facsimile:  (212) 447-7077

**STROM LAW FIRM, LLC**
Mario Pacella
2110 N. Beltline Blvd., Suite A
Columbia, South Carolina 29204
Telephone: (803) 252-4800
Facsimile: (803) 252-4801

*additional attorneys for plaintiffs*

CLASS ACTION COMPLAINT