IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - X
EDWARD HUYER, et al.,          :
                              :
     Plaintiffs,              :
                              :
vs.                          :        Case No. 4:08-cv-00507
                              :
WELLS FARGO & CO. and         :
WELLS FARGO BANK, N.A.,        :        HEARING TRANSCRIPT
                              :
     Defendants.             :
- - - - - - - - - - - - - X


                         Courtroom, Fourth Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         Thursday, January 21, 2016
                         10:00 a.m.


BEFORE:  THE HONORABLE ROBERT W. PRATT, Senior Judge.




                         - - -




                  KELLI M. MULCAHY, CSR, RMR, CRR
                     United States Courthouse
                  123 East Walnut Street, Room 115
                     Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiffs:        DEBORAH CLARK-WEINTRAUB, ESQ.
                           Scott & Scott, LLP
                           The Chrysler Building
                           405 Lexington Avenue, 40th Floor
                           New York, New York  10174

                           MICHAEL R. REESE, ESQ.
                           Reese, LLP
                           875 Avenue of the Americas, 18th Floor
                           New York, New York  10001

                           TODD GARBER, ESQ.
                           Finkelstein, Blankinship,
                            Frei-Pearson & Garber, LLP
                           1311 Mamaroneck Avenue
                           White Plains, New York  10605

For the Defendants:        MARK D. LONERGAN, ESQ.
                           REBECCA SNAVELY SAELAO, ESQ.
                           JOHN B. SULLIVAN, ESQ.
                           Severson & Werson
                           One Embarcadero Center, 26th Floor
                           San Francisco, California  94111

                           JESSE LINEBAUGH, ESQ.
                           Faegre Baker Daniels, LLP
                           801 Grand Avenue, Suite 3100
                           Des Moines, Iowa  50309-8002

                           CHAD R. ANDERSON, ESQ.
                           Wells Fargo Law Department
                           800 Walnut Street
                           Des Moines, Iowa  50309

1                    P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  Please be seated.

4              MR. MESSINA:  Your Honor, the case before the Court

5    this morning is Huyer, et al. vs. Wells Fargo & Company, et al.

6              Counsel, please enter your appearances for the record.

7              MS. CLARK-WEINTRAUB:  Good morning, Your Honor.

8    Deborah Clark-Weintraub from Scott & Scott for the plaintiffs.

9              THE COURT:  All right.

10             MR. REESE:  Morning, Your Honor.  Michael Reese from

11   Reese, LLP on behalf of the plaintiffs.

12             MR. GARBER:  Todd Garber, Finkelstein, Blankinship,

13   Frei-Pearson & Garber, for the plaintiffs.

14             MR. LONERGAN:  Good morning.  Mark Lonergan of

15   Severson & Werson representing Wells Fargo Bank.

16             MS. SNAVELY SAELAO:  Good morning, Your Honor.

17   Rebecca Saelao, also of Severson & Werson, representing Wells

18   Fargo Bank.

19             MR. SULLIVAN:  And John Sullivan, from Severson &

20   Werson, representing Wells Fargo Bank.

21             MR. LINEBAUGH:  And good morning, Judge Pratt.  Jesse

22   Linebaugh from Faegre Baker Daniels.  With us as well is Chad

23   Anderson, our client from Wells Fargo.

24             THE COURT:  Thank you very much.

25             Okay.  Ms. Clark-Weintraub, I think it's your burden,

1  so why don't I listen and let you proceed.

2          MS. CLARK-WEINTRAUB:  May I use the podium?

3          THE COURT:  You may.

4          MS. CLARK-WEINTRAUB:  May it please the Court.

5          We are here this morning on Plaintiffs' motion for

6  final approval of a $25.75 million settlement of this class

7  action against Wells Fargo.  As we've stated in our papers, Your

8  Honor, we respectfully submit that the proposed settlement is an

9  excellent recovery for the class given the risks of continued

10  litigation and the substantial risks and uncertainties even with

11  maintaining the action as a class action going forward.

12          The proposed settlement provides a substantial benefit

13  for the class, and it eliminates the substantial risks, which

14  I'll talk about a little bit in a few minutes, and most

15  importantly, it eliminates the risk that if the litigation had

16  continued the plaintiffs and the class may have recovered much

17  less or even nothing at all.

18          Importantly, the settlement was reached at a point in

19  the litigation where Plaintiffs and their counsel were in an

20  excellent position to evaluate the strengths and weaknesses of

21  the claims versus the settlement benefit.  The settlement, as

22  Your Honor is aware, was reached after seven years -- almost

23  seven years of litigation.  At the time the settlement was

24  agreed to in principle, merits discovery was almost entirely

25  completed, and we were about to enter the expert phase of the

1  case.

2          Further, the settlement, as Your Honor is aware, was

3  reached after a mediation with a very well-respected mediator

4  that's known to the Court, the Honorable Arthur Boylan, and the

5  case law holds that under these circumstances where a class

6  action settlement has been negotiated at arm's length by

7  experienced counsel with substantial discovery with the help of

8  a neutral, a settlement of a class action is presumptively fair.

9          And, Your Honor, since the Court granted preliminary

10  approval back in September, notice has been disseminated to the

11  class, and there has been very limited opposition to the

12  settlement from class members, notwithstanding that this is a

13  very large class, more than 2.7 million class members, as we

14  stated in our papers.

15          We have received only 13 objections, and as we noted

16  in our reply papers filed a week or so ago, several of those

17  objections are from so-called serial or professional objectors

18  who come in and routinely object to class action settlements.

19          In addition, we have received only 219 requests for

20  exclusion.  Five of those are technically untimely under the

21  terms of the settlement.  And we can talk about this at the end.

22  Plaintiffs would request that the Court allow the late

23  exclusions, and I'm sure Wells Fargo will want to be heard with

24  respect to that issue.

25          But the point at the outset is that there is, again,

6

1  very limited opposition to the settlement from class members,

2  which we believe supports our assertion that the settlement is

3  an excellent recovery given the claims and the risks of

4  prevailing on the claims in the case.

5        In view of all that, obviously, the Court has to

6  evaluate the settlement using the Van Horn factors that the

7  Eighth Circuit has set out, and I'll turn to that in a couple of

8  minutes, because we've discussed those at length in our papers,

9  and I think we've probably said most of the important things

10 that need to be said about them.  And, obviously, if the Court

11 has any questions, I'd be happy to answer them.

12        But I wanted to start this morning with the article

13 that Judge Bucklo had written which Your Honor obviously thought

14 was very helpful, and we did too, and so I'd like to address

15 each of the issues Judge Bucklo sets forth in her article and

16 explain why we believe those are either not issues in the case

17 or why circumstances here support approval of the settlement.

18        So just briefly, Your Honor, the first issue that

19 Judge Bucklo raised in her article was the issue of the

20 availability of insurance and the amount of insurance, which

21 obviously, in many class action cases, is an important data

22 point for the Court in deciding whether or not a settlement

23 should be approved.

24        Here there was no insurance so --

25        THE COURT:  Ms. Clark-Weintraub --

1          MS. CLARK-WEINTRAUB:  Yes.

2          THE COURT:  -- did you find the article as helpful as

3    I did?

4          MS. CLARK-WEINTRAUB:  I did.  I did, Your Honor.  I

5    thought Judge Bucklo's -- the issues that she raised are very

6    important.  I think they are important for a court to consider

7    in deciding whether or not to approve a class action settlement.

8    I think there are very important issues.

9          THE COURT:  Plagiarism is the highest form of

10   flattery, I guess, but it made sense to me that I should share

11   it with the lawyers when I saw it, so --

12         MS. CLARK-WEINTRAUB:  Yes, Your Honor.  And,

13   obviously, we appreciate that you did that.

14         THE COURT:  I apologize for interrupting.  Go ahead.

15         MS. CLARK-WEINTRAUB:  That's okay.  So the--

16         THE COURT:  So insurance doesn't factor into this?

17         MS. CLARK-WEINTRAUB:  Doesn't factor in.  Wells Fargo

18   paid the entire settlement amount, which is sitting in escrow,

19   out of its own pocket, which we believe is a significant factor

20   in showing that this is a significant achievement, this

21   settlement, the fact that Wells Fargo paid it out of its own

22   pocket, because, as Judge Bucklo observed in her article, even

23   large companies don't like to reach into their pockets to pay a

24   settlement.  And so we think the fact that Wells Fargo did that

25   here supports our assertion that this is a significant result

1    for the class.

2         The second item that Judge Bucklo highlighted in her

3    article was the extent of discovery that preceded the class

4    action settlement.  Here there was no so-called confirmatory

5    discovery.  As I said a few moments ago, merits discovery was

6    almost entirely completed at the time the settlement was

7    reached.

8         We did discuss in some detail the discovery that was

9    taken in terms of the numbers of documents and depositions, et

10   cetera, that were taken, but Judge Bucklo suggested that it

11   would be helpful for a court to know a little bit more detail

12   behind those numbers, and so let me give that to the Court now

13   so that you have it.

14        In terms of depositions, as we said in our papers,

15   there were 12 depositions taken or defended by the plaintiffs'

16   counsel in the case.  Each of the plaintiffs was obviously

17   deposed in advance of the class certification motion, and,

18   obviously, those depositions were defended by the plaintiffs'

19   counsel.

20        Plaintiffs took eight depositions in the case.  Most

21   of the deponents were high-level executives and/or managers in

22   the property preservation area of Wells Fargo, which is the area

23   within the company that is responsible for overseeing the

24   implementation of the policies with respect to property

25   inspections and property inspection fees.

1          THE COURT:  Are those people in West Des Moines or are

2    they in San Francisco or --

3          MS. CLARK-WEINTRAUB:  They were in Des Moines, Your

4    Honor.  All of the -- let me just think.  Yes.  All of the --

5    except for one.  I take -- no.  All of the depositions were here

6    in Des Moines, all of them.

7          THE COURT:  All right.

8          MS. CLARK-WEINTRAUB:  And also some of the witnesses,

9    in addition to being questioned about the policies and

10   procedures Wells Fargo used to order and then charge borrowers

11   for property inspections, they were deposed concerning GSE

12   guidelines and investor servicing guidelines that they were

13   following.

14         Certain of the witnesses were also knowledgeable and

15   deposed regarding how Wells Fargo accounted for property

16   inspection fees on its books because we were interested,

17   obviously, in later stages of the case, in tracing those

18   payments through so that we would be able to show, hopefully, if

19   we had to go to trial, that the payments were made, in fact, by

20   the borrowers or were still owed by the borrowers and so were

21   reflected on the borrower records.

22         THE COURT:  Let me go back.  When you said the

23   plaintiffs were deposed, is that Mr. and Mrs. Huyer or the

24   Castros or which plaintiffs?

25         MS. CLARK-WEINTRAUB:  All of them.  Mr. and Mrs. Huyer

1   were deposed, and Mr. and Mrs. Castro were deposed as well.

2          THE COURT:  Okay.  Thank you.

3          MS. CLARK-WEINTRAUB:  So the fact witnesses from Wells

4   Fargo who were deposed with respect to the issues I just

5   summarized were Keith Schares, who is a Wells Fargo vice

6   president, who had responsibility for the property preservation

7   and default accounts payable areas at the bank.

8          He also headed the corporate advance reconciliation

9   team at one point, and, as Your Honor may or may not recall from

10  our papers, you know, corporate advances are -- some property

11  inspection fees are recorded on the books of Wells Fargo as

12  corporate advances, and so he was able to talk about issues

13  concerning how those fees appeared on the books of Wells Fargo

14  and how they appeared on borrower accounts as well.

15         We also deposed Sherilee Massier, who was a manager

16  within the Wells Fargo property preservation area, and also

17  Deric Gourd, who was a business systems analyst in that area,

18  and he had particular knowledge with respect to a document that

19  was called the matrix.  And you may recall that document, Your

20  Honor, from the class certification briefing, but that was the

21  document that contained the coding which would determine when a

22  property inspection would be ordered and/or suppressed by Wells

23  Fargo.

24         So those were certain of the depositions we took on

25  the merits issues of the case.  We also issued a series of

1   30(b)(6) notices with respect to other issues.  So, for example,

2   we had a 30(b)(6) deposition of a Wells Fargo vice president

3   named Midge Baker, who was a vice president in the default

4   reporting area of Wells Fargo, and she was knowledgeable about

5   the operation of the Fidelity system, which was the computer

6   system that Wells Fargo used to order property inspections.

7          We also noticed several 30(b)(6) depositions with

8   respect to either GSE and investor guidelines for ordering

9   property inspections and assessing their costs and also issues

10  concerning Answers to Interrogatories that Wells Fargo had

11  provided with respect to potential damages questions and numbers

12  of inspections that had been ordered.

13         After the class was certified, Wells Fargo produced,

14  as we say in our papers, about 13.5 gigabytes of data,

15  loan-level data for the class members, and we also had a

16  30(b)(6) deposition with respect to that data.  A gentleman by

17  the name of Ronnie Rittenhouse, who is a manager in the

18  servicing data analytics section of Wells Fargo who had

19  supervised the pulling of that data, was deposed with respect to

20  what the data showed, the various coding in the data, because,

21  again, we at that point were getting ready to work, you know,

22  provide -- we had provided that data to our expert, and they

23  obviously had to work with the expert to determine what the data

24  we received showed, was there additional data that we need to

25  ask Wells Fargo to pull, et cetera.  So Mr. Rittenhouse was

1   deposed.  I believe it was last January, if I'm not mistaken.

2          And then finally, Plaintiffs also deposed Wells

3   Fargo's class certification expert, Dr. William Hamm, who is an

4   economist and was also an economist with experience in the

5   mortgage servicing industry, and he was also subsequently

6   designated as Wells Fargo's merits expert on mortgage servicing

7   issues.

8          THE COURT:  So of the eight non -- or the eight

9   depositions taken that weren't of the plaintiffs, how many of

10  those were experts?

11         MS. CLARK-WEINTRAUB:  There was just the one expert,

12  Dr. Hamm, in connection with class certification.

13         THE COURT:  Ms. Weintraub, I'm having a difficult

14  time understanding the settlement from the perspective of I

15  don't know what the normal, if there was such a thing, is.  We

16  have '04 to '13.  But a drive-by security check, that's what

17  I'll call --

18         MS. CLARK-WEINTRAUB:  Uh-huh.

19         THE COURT:  -- the primary item of damage, what's the

20  charge that appeared on a homeowner's bill from Wells Fargo?  Is

21  it $20?  Is it $80?  I have no way of --

22         MS. CLARK-WEINTRAUB:  It was either 15 or 20 dollars,

23  depending upon what year it was.  There was a point in time, I

24  want to say it was in 2010, that the charge changed to $20, but

25  before that it was $15.  So each inspection was either 15 or 20

1   dollars, and it would appear on the statement under a heading

2   "Other Charges," so it would not be identified as a property

3   inspection fee.

4            THE COURT:  That's what your discovery went to, the

5   way they charged these drive-by security checks?

6            MS. CLARK-WEINTRAUB:  Yes.  Yes.

7            THE COURT:  Okay.

8            MS. CLARK-WEINTRAUB:  Our discovery went to that.  It

9   also went to, you know, what -- their defense in the case was

10  that they were charging or ordering and charging for property

11  inspections consistent with guidelines, both GSE guidelines and

12  investor guidelines, and there was discovery taken about that as

13  well.

14           And then again, once we got down into the granular

15  level of the data and what charges were there, there were

16  disputes about whether or not plaintiffs could prove that a

17  payment, for example, actually came from the borrower as opposed

18  to being paid by some third party, for example, in a foreclosure

19  situation.

20           THE COURT:  Okay.  So active loans, if I have 921,241

21  class members, would each of them have been the victim of a

22  drive-by security check?

23           MS. CLARK-WEINTRAUB:  They would have had at least

24  one, as I understand it, one inspection fee, drive-by security

25  check inspection fee.

```
1              THE COURT:  I don't know what to call it --

2              MS. CLARK-WEINTRAUB:  Right.

3              THE COURT:  -- so you tell me the right terminology.

4              MS. CLARK-WEINTRAUB:  No.  That's fine.

5              THE COURT:  Okay.

6              MS. CLARK-WEINTRAUB:  But they would have had at least

7   one of those inspections ordered.

8              THE COURT:  Okay.

9              MS. CLARK-WEINTRAUB:  Now, whether they would have

10  paid for that inspection and whether that inspection fee would

11  have been waived, that's another issue, but my understanding as

12  to how Wells Fargo pulled the data is if there was at least one

13  inspection ordered --

14             THE COURT:  Okay.

15             MS. CLARK-WEINTRAUB:  -- they were on the list.

16             THE COURT:  But my understanding is all of those

17  people are going to be paid; they don't need to fill out a form,

18  they're going to be paid?

19             MS. CLARK-WEINTRAUB:  The active people are going to

20  be paid automatically.

21             THE COURT:  Right.  Right.

22             MS. CLARK-WEINTRAUB:  The paid-in-full loans, those

23  people will be paid automatically.

24             THE COURT:  Right.

25             MS. CLARK-WEINTRAUB:  The only people who need to
```

1    complete the claim forms are the post-sale --

2            THE COURT:  Post-sale.

3            MS. CLARK-WEINTRAUB:  -- group because of the

4    limitations with the data.

5            THE COURT:  I apologize again for interrupting.  You

6    can pick up where I interrupted you.

7            MS. CLARK-WEINTRAUB:  That's okay.

8            So I think I've described the deposition testimony

9    that's been taken.  Obviously, just briefly on the documents,

10   most of the documents and data that was produced, obviously,

11   came from Wells Fargo, and those types of -- the types of

12   documents that were produced in addition to the data included,

13   you know, servicing guidelines, documents relating to the

14   plaintiffs' loans.  There were e-mail -- e-mail of relevant

15   personnel were produced after the parties agreed on custodians

16   and search terms to be used in conducting a search of e-mail.

17   So all of those documents were produced.

18           We also received documents from a company that at the

19   time was called LPS, which was the company that owned the

20   Fidelity system.  They produced manual-type documents, for lack

21   of a better word, which described how the Fidelity system

22   operated and how it reflected certain information.

23           We also subpoenaed and obtained documents from the

24   property inspection vendors who actually conducted the drive-by

25   inspections of the property, and we received documents from them

1   such as their contractual arrangements with Wells Fargo and

2   certain documentation relating to the inspections that were

3   conducted on the plaintiffs' --

4           THE COURT:  So Wells Fargo outsourced this?

5           MS. CLARK-WEINTRAUB:  Wells Fargo did not conduct the

6   inspections itself.  It did have vendors that did that, yes.

7           THE COURT:  Okay.  Ms. Clark-Weintraub, is this kind

8   of lawsuit the first of its kind?  I know I have all kinds of

9   resumes from all the law firms that tell me they did consumer

10  work.

11          MS. CLARK-WEINTRAUB:  Uh-huh.

12          THE COURT:  Have large financial institutions or, for

13  that matter, small financial institutions been the subject of

14  being defendants in these kinds of class actions before your

15  lawsuit?

16          MS. CLARK-WEINTRAUB:  Not for -- to my knowledge, Your

17  Honor, not for property inspection fees specifically.  Our case

18  was the first in that regard.  But, obviously, the banks have

19  been sued for all sorts of other types of charging and claims.

20  There were, you know, claims about check ordering that were

21  settled at one point.  There were forced-place insurance cases.

22          So there are many, many, you know, consumer cases that

23  are brought against the banks for conduct of one sort or the

24  other, but this, again, to our knowledge, after the, you know,

25  findings of the court in Louisiana, which, obviously --

1          THE COURT:  Right.

2          MS. CLARK-WEINTRAUB:  -- we alleged in our

3    complaint --

4          THE COURT:  That was in bankruptcy court, wasn't it?

5          MS. CLARK-WEINTRAUB:  That was, yes, Your Honor.  So

6    ours was the first action that tried to recoup those charges on

7    behalf of a class of insurers.

8          I will tell the Court that after our case was brought,

9    and particularly after we survived the motion to dismiss, to

10   some degree, and then obtained class certification, other cases

11   were brought against other banks for the same conduct, and some

12   of those are cited in our papers because the courts in those

13   cases didn't -- their rulings were not as favorable to the

14   plaintiffs in those cases as the rulings that we obtained in our

15   case.  And so that's --

16         THE COURT:  Right.

17         MS. CLARK-WEINTRAUB:  Does that answer your question?

18         THE COURT:  Thank you.

19         MS. CLARK-WEINTRAUB:  So getting back to Judge

20   Bucklo's article, so that, I think, is a fairly comprehensive

21   summary of the deposition and document discovery that was taken

22   in the case.

23         You know, all of the documents were reviewed by

24   attorneys at the counsel for the plaintiffs' offices, and,

25   obviously, the data we provided to a data analytics firm and we

1   worked with them to slice, you know, and dice the data.

2          THE COURT:  What does the data analytics firm do?

3          MS. CLARK-WEINTRAUB:  It took the chart, the data that

4   Wells Fargo produced, and it was able to break it down for us

5   into initial inspections, subsequent inspections, delinquency

6   inspections versus corporate advance inspections.  And so we

7   used -- they identified waivers of fees, payments, assessments

8   so they were able to at least begin that process at the time of

9   the mediation with Judge Boylan.

10         THE COURT:  And is that what -- the expenses claimed

11   are not very detailed.  Is that some of the expenses that you

12   seek reimbursement for, to these analytics firms?

13         MS. CLARK-WEINTRAUB:  Yes.  Among others.  We had

14   worked with four different experts in the case.  We had had to

15   produce a report from a merits experts on mortgage loan

16   servicing issues, so there was an expert named Wyatt who was our

17   expert on those issues.  We also worked with a -- and he was a

18   disclosed expert under Rule 26.

19         We also worked with various consulting experts whose

20   identities I won't disclose in open court.  But so we worked

21   with a forensic accounting expert.  You know, as I said before,

22   we were trying to trace payments through and trying to figure

23   out what issues existed in that regard so we worked with a

24   forensic accounting firm to do that.  Then we worked with two

25   different data analytics firms.  One we weren't satisfied with

1    initially and so we replaced that person with a second firm who

2    performed much -- in a much better fashion.

3         So, again, getting back to Judge Bucklo's article,

4    there was a significant amount of discovery taken in the case,

5    and if the Court requires any additional information with

6    respect to any particular depositions or documents, we'd

7    obviously be happy to --

8         THE COURT:  Would you send me something after we

9    conclude here?  I'm going to want more than this, but give me

10   the dates and the names of the deponents.

11        MS. CLARK-WEINTRAUB:  Yes.

12        THE COURT:  That would be helpful.  You can do it in

13   e-mail.  That way you don't have to worry about filing it.  Just

14   copy the defendants.

15        MS. CLARK-WEINTRAUB:  Okay.  We will do that.

16        Okay.  The third issue that Judge Bucklo notes in her

17   article is whether or not -- that the Court should be wary

18   whether or not other pending actions that are tangential to the

19   subject matter of a class action are somehow being released

20   through the class action settlement, and that is not happening

21   here.

22        As we said in our papers in response to some of the

23   objections that are received -- that were received, the release

24   here is narrowly tailored to the property inspection fee issue

25   and Wells Fargo's practices with respect to property

1    inspections.

2           The next item Judge Bucklo highlighted were claims

3    rates and pro rata share, and she urges courts to delve into the

4    issues of class size and expected recovery per dollar loss.  And

5    here the class size, again, you know, we have 2.7 million loans

6    that were impacted here.

7           You know, the law regarding what needs -- what a court

8    needs to evaluate in terms of loss in approving a class action

9    settlement varies from circuit to circuit.  In the Seventh

10   Circuit, where Judge Bucklo is a district judge, they have some

11   pretty specific rules about what has to be reviewed by the

12   judge.  The Eighth Circuit's most recent pronouncement on the

13   issue was in the Marshall v. National Football League case, and

14   I can --

15          THE COURT:  Right.  I hadn't seen it referred to.

16   Judge Bye in that case said that the court should look at this

17   like a private contract negotiated by two people.  I hadn't seen

18   that before.  Is that a normal formulation of the court's job?

19          MS. CLARK-WEINTRAUB:  It's a little -- I would say,

20   you know, I mean, obviously, the court is acting in a fiduciary

21   capacity, and I think the court, as Judge Bucklo highlights in

22   the article, has to, you know, overview the situation to make

23   sure that the rights of absent class members are not being

24   impinged upon in terms of settlement.

25          I think, you know, where the Eighth Circuit may

1  diverge from the Seventh Circuit in this regard is whether or

2  not the court has to make specific factual findings about what

3  is the maximum recovery the plaintiffs could have achieved, you

4  know, on this claim or that claim versus how much of the

5  settlement --

6        THE COURT:  Well, the estimates in your papers tell me

7  that the exposure that Wells Fargo had was between 100 million

8  and 115, if I recall.

9        MS. CLARK-WEINTRAUB:  Well, that was our best

10  estimate --

11        THE COURT:  Okay.

12        MS. CLARK-WEINTRAUB:  -- of our strongest claims.

13        THE COURT:  And is that based on your experts and

14  counsel's consensus or what?

15        MS. CLARK-WEINTRAUB:  Well, that was based on our

16  experts' preliminary estimates when we were doing the mediation

17  with Judge Boylan.

18        So as we explained in our papers, you know, obviously,

19  we thought various aspects of the claim were stronger than

20  others, and in the Marshall case the Eighth Circuit makes the

21  point that, you know, it's really not -- it's not helpful to the

22  court to just work with numbers because a number is a number and

23  it doesn't say anything about whether or not a party is going to

24  be able to prevail on that claim and achieve that number.

25        So, obviously, we felt that there were certain

1  property inspection claims that we had a better chance of

2  winning than others.  For example, the initial inspections, we

3  thought that a jury might be persuaded by Wells Fargo's argument

4  that, you know, well, gee, at least we should have had the

5  ability to go out and inspect once, right, just to make sure

6  everything was okay.

7          So we viewed -- you know, after discovery, after

8  obtaining all the discovery we did, we viewed those claims as

9  not nearly as strong as a situation where, like the Navas

10 Castros went through, you had month after month after month, you

11 know, of clean inspections but yet another inspection being

12 conducted and another charge being put on the account.  So there

13 were -- you know, as I said, there were different charges, and

14 we thought that we had a better chance of success with respect

15 to some than others.

16         But with respect to the estimate we had in our papers,

17 100 to 115, those were for the subsequent inspections that were

18 paid that we could show were paid by the borrower or were still

19 outstanding on the active loan accounts, and so we thought those

20 were the best claims that we had the best chance of success on,

21 and so we felt that the settlement that we achieved, 25.75

22 million, in light of that range of potential recovery, was, you

23 know, fair and reasonable and adequate under Rule 23.

24         Judge Bucklo's article goes on to say that you

25 should -- the court should, you know, determine a per-dollar

1   loss or do a per-dollar loss calculation.  I mean, we did not do

2   that in our papers, but still if you took the 100- to

3   115-million-dollar range and divided it by the amount of the

4   settlement, you know, after you deduct notice and administration

5   costs, you know, assume just for purposes of this calculation,

6   you know, the fee and expense award requested, you'd get a

7   recovery of about 13 cents on the dollar for every dollar lost.

8   So that, again, given the cases which we have cited in our

9   papers, we think that is an eminently reasonable settlement in

10  this case given the substantial risks to prevail.

11          The next issue Judge Bucklo raised was the claims

12  process, and I think we've discussed that already with the

13  active and paid.  Here there is no claims process for the active

14  and paid-in-full loans.  Those are automatically getting checks

15  once the calculations are done.  The post-sale loans have to

16  file the claims because of the data limitations.  We cited in

17  our papers other cases in which this sort of hybrid approach was

18  taken for this very reason.  It was approved by the court.

19          THE COURT:  Is there any kind of median or average

20  check that active and paid-in-full are likely to get?

21          MS. CLARK-WEINTRAUB:  You know, I don't know that

22  we've done that calculation, and I don't know that it could be

23  done until the claims process is complete.  I mean, I'd have to

24  think about that.

25          You know, obviously, in the plan of allocation

1    formula, different fees are weighted --

2              THE COURT:  Right.

3              MS. CLARK-WEINTRAUB:  -- in different ways given the

4    strength of the claim, so I don't know that there would be an

5    average across the board.

6              THE COURT:  Okay.

7              MS. CLARK-WEINTRAUB:  The next issue Judge Bucklo

8    raises in her article is the issue of reversion and cy pres.

9    There is no reversion in this case.  Wells Fargo is not going to

10   get any of this money back.

11             In terms of cy pres, there is a provision for cy pres

12   but only after there's been two rounds of distributions to class

13   members, and let me explain just briefly how that works.  And

14   this is -- if the Court wants to look at it later, it's laid out

15   in Section --

16             THE COURT:  Where do I find that?  I must have missed

17   this.  Where do I find the cy pres reference?

18             MS. CLARK-WEINTRAUB:  It's in Section 6.07 of this

19   settlement stipulation.

20             THE COURT:  Okay.  Do you know which document that is?

21             MS. CLARK-WEINTRAUB:  Yes.  It's Document 243-3.

22             THE COURT:  243-3?

23             MS. CLARK-WEINTRAUB:  Yes.

24             THE COURT:  Okay.  Thank you.

25             MS. CLARK-WEINTRAUB:  And it starts on page 25 and

1 then goes over to 26.  But specifically, it's laid out in

2 subparagraph (c), 6.07, subparagraph (c).

3         THE COURT:  6.07.

4         MS. CLARK-WEINTRAUB:  So after the claims process is

5 complete, the administrator will issue checks, obviously based

6 upon the recognized loss calculations, to all the class members

7 with the active and paid-in-full loans and those class members

8 with post-sale loans who have filed claims.  The checks will be

9 good for a period of 90 days, and so, you know, there is,

10 obviously, the potential that somebody who gets a check doesn't

11 cash it, and if they don't cash it, obviously, there's going to

12 be money left in the fund.  So the agreement provides --

13         THE COURT:  It --

14         MS. CLARK-WEINTRAUB:  Yes, sir.

15         THE COURT:  It says here at the bottom, "If, six

16 months after such redistribution, any funds remain in the Net

17 Settlement Fund, then such balance shall be contributed to the

18 United Way."  Is that -- United Way of where?

19         MS. CLARK-WEINTRAUB:  United Way of --

20         MR. LONERGAN:  We haven't specified a local chapter.

21         MS. CLARK-WEINTRAUB:  Yeah.  We haven't specified a

22 local chapter, but it's to be earmarked for --

23         THE COURT:  Right.  Doesn't she say -- I've not had

24 this before, but doesn't she say it generally has to go to the

25 same kind of damage or recovery that a typical plaintiff would

1  receive?

2        MS. CLARK-WEINTRAUB:  Well, I think it has to be

3  reasonably related to the claims in the case.

4        THE COURT:  Okay.

5        MS. CLARK-WEINTRAUB:  So that's why we say in the

6  stipulation that it is to be contributed to the United Way with

7  funds earmarked for financial education classes so --

8        THE COURT:  Okay.  But not United Way of Central Iowa

9  or -- there's been no discussion about that?

10       Okay.  My circuit disapproved of a cy pres settlement

11  not too long ago, Judge Loken, regarding legal services.  Are

12  you familiar with that case?

13       MS. CLARK-WEINTRAUB:  No, I'm not, Your Honor.  But

14  let me just make the point --

15       THE COURT:  Right.  Right.

16       MS. CLARK-WEINTRAUB:  -- that I don't consider this a

17  cy pres settlement.

18       THE COURT:  Okay.

19       MS. CLARK-WEINTRAUB:  I think in any class action, no

20  matter how many rounds of distribution you make, you're always

21  going to be left with some minimal amount of funds at the end of

22  the day because it's just simply not all distributed and not all

23  claimed.  And it's fairly typical, at least in my experience,

24  for there to be some sort of a cy pres distribution at the end

25  of the day after there have been at least several rounds of

1  distribution to the class members.

2          THE COURT:  So --

3          MS. CLARK-WEINTRAUB:  And again --

4          THE COURT:  -- this isn't cy pres?

5          MS. CLARK-WEINTRAUB:  I guess technically the last

6  part of it is, but, I mean, it's not like a consumer settlement

7  where the class members are getting no or limited relief and the

8  bulk of the settlement is being contributed to some charitable

9  organization.  That's not what is happening here.

10          Here, at the end of the claims process, the monies,

11  after deduction for expenses, are going to be sent out to

12  everybody, and either those checks are going to be cashed by the

13  class members or they won't be, and if they're not and there's

14  funds remaining, we're going to do a second round of

15  distributions out to the class members, and it would be our

16  expectation that after the second round there will be not a lot

17  of -- you know, not millions and millions and millions of

18  dollars of funds left in the account.

19          So we would expect it to be, you know, a minimal

20  amount, and, obviously, before the -- you know, before the funds

21  are distributed anywhere, we would have to come to the Court for

22  the Court to sign the distribution order.

23          THE COURT:  You were about to remark on another one of

24  Judge Bucklo's points when I interrupted you.

25          MS. CLARK-WEINTRAUB:  Yeah.  I was just going to go

1   through the paragraph, which we've just done, in the settlement

2   stipulation.  So, again, we have two rounds in the distribution.

3   In the second round the checks will go to anyone who cashed

4   their check the first time around and has a distribution of at

5   least $25 because, obviously, the more de minimis the checks

6   are, the less incentive somebody would have to cash the check

7   potentially.

8           And so in this matter, I mean, there's no reason to

9   send checks to people who didn't cash them the first time

10  around, right?  It's just a waste of money, and, obviously,

11  it's, you know, costly to keep sending out checks for the postal

12  charges, et cetera.

13          So then, as I said, only after that second round of

14  distribution, if there's any money remaining, would there be the

15  award to the United Way with the funds earmarked for financial

16  education classes for consumers, as we discussed.

17          So that leaves, I think, one more issue that Judge

18  Bucklo talked about in her article, which is the class notice

19  and the importance of ensuring that the class notice complies

20  with due process and that it has -- it contains the right

21  substance.

22          I don't think there can be much dispute, Your Honor,

23  that the class notice procedures and the substance of the

24  notices in this case do comply with due process.  We had direct

25  mail notice.  The postcards went out to 2.7 million class

1   members.  And this is all laid out in the declarations of the

2   claims administrator, Jennifer Keough, and then the supplemental

3   declaration of Lisa Castaneda laying out all of the notices that

4   were made.

5          They also mailed additional notice packets in response

6   to inquiries from class members, over 20,000 of them.  The

7   notice was also published in both The Wall Street Journal and

8   over the NPR newswire.  It was posted on the settlement Web site

9   the Garden City Group print administrator maintains.

10          And this means of notice, direct mail notice

11   supplemented in this way by, you know, publication notice, the

12   settlement Web site, telephone support by the claims

13   administrator, this form of notice has repeatedly been upheld.

14          THE COURT:  Was it just a simple error that they did

15   it a month early, The Wall Street Journal?  Is that what

16   happened?

17          MS. CLARK-WEINTRAUB:  Yes.  Yes.

18          THE COURT:  Okay.

19          MS. CLARK-WEINTRAUB:  Yes.  They did it again, though.

20          THE COURT:  Okay.

21          MS. CLARK-WEINTRAUB:  So they did it twice, once for

22   free.

23          THE COURT:  Okay.

24          MS. CLARK-WEINTRAUB:  And then again, the contents of

25   the notice also comply with due process.  I mean, the notice

1    appropriately describes the subject matter of the litigation,

2    informs class members of their rights to either object or opt

3    out or remain in the class, and so we don't think there is any

4    issue that the class notice was adequate and complies with due

5    process in this case.

6              So I think that takes care of the issues that Judge

7    Bucklo talked about in her article, unless Your Honor has any

8    further questions on those.

9              THE COURT:  Well, she did say that this settlement

10   process does not favor the judge.  So I don't know if she's been

11   reversed by Judge Posner, like most judges in the Northern

12   District, or not.

13             Let me go to the merits for a moment.  The way I read

14   the papers, and you lawyers help me if I didn't get it

15   correctly, is that the RICO claim is very weak.  I didn't hear

16   much about the California consumer claim.  Did I get the right

17   impression from both of those conclusions that the RICO claim

18   was weak primarily because of the lack of the collusive factor,

19   I guess?  Never having tried a RICO case, I don't know.

20             MS. CLARK-WEINTRAUB:  Uh-huh.

21             THE COURT:  And I didn't see much addressed by the

22   California consumer claim.  Maybe I missed it.  But that was

23   kind of my two impressions about the merits of the legal theory

24   of the case that would be submitted.

25             MS. CLARK-WEINTRAUB:  Yes, Your Honor.  I think their

1   RICO claim did have issues, and --

2           THE COURT:  That's another way of saying it's weak?

3   You can be frank with me.  I'm trying to -- yes.  Go ahead.

4           MS. CLARK-WEINTRAUB:  There were substantial risks to

5   our prevailing on the RICO claims, Your Honor.  And, you know,

6   as we said in our papers, quite candidly, and we cited all the

7   decisions, as I said, there were all of these additional

8   property inspection fee cases brought against other lenders

9   after the initial successes in our case, and in those cases the

10  RICO claims were dismissed for failure to plead, you know, a

11  fraudulent purpose.  So, yes, the RICO claim was in jeopardy,

12  let me put it that way.

13          In terms of the California claim, again, that was only

14  a state law class.

15          THE COURT:  Right.

16          MS. CLARK-WEINTRAUB:  So now you're going from a

17  nationwide situation to a statewide situation.  You know, Wells

18  Fargo, in earlier stages of the litigation, had made, you know,

19  very vociferous arguments against the California UCL claim,

20  which Your Honor rejected.  In particular you may recall they

21  cited the Walker and there was one other case whose name is

22  escaping me at the moment, but those were appellate cases in

23  California state court which upheld the rights of servicers in

24  broad terms to inspect delinquent properties.

25          Now, obviously, we made arguments to Your Honor that

1   those cases were distinguishable, the claims were far broader

2   than the claims we were bringing here.  Your Honor agreed with

3   our assessment of those cases, but that doesn't mean that, you

4   know, there wasn't jeopardy on appeal, obviously.

5          And, you know, really the whole case came down to when

6   was it reasonable for Wells Fargo to conduct a property

7   inspection and did they have an incentive to inspect more than

8   was reasonably necessary to protect the lender's interest in the

9   property, and they argued, and the evidence as it came in gave

10  them plenty of ammunition to argue, that they did not have any

11  incentive.

12         They did not mark up the fees, unlike other mortgage

13  servicers in the industry.  You know, there was, you know,

14  minimal evidence that they would make money on the float.  If

15  Your Honor may recall, that was one of our theories, that they

16  made money on the float, so they collected the fees from the

17  borrower and then, you know, there was a period of time between

18  that collection and when they had to pay the vendor.

19         Their witnesses, Mr. Schares, who I mentioned earlier,

20  among them, testified adamantly that that was impossible because

21  Wells Fargo would immediately pay its vendors within -- I forget

22  the precise number of days, but maybe 10, 15 days of getting a

23  bill, whereas the evidence seemed to show that borrowers were

24  not very timely in paying property inspection fees if they paid

25  them at all.  So even with respect to, you know, certain aspects

1    of the UCL claim, there were issues as well.

2          THE COURT:  How long did you anticipate, you and your

3    co-counsel, that the trial would last?

4          MS. CLARK-WEINTRAUB:  Probably ten days to two weeks,

5    I would have guessed.  I mean, obviously, RICO is a pretty

6    complicated statute, if we had managed to hang on to it through

7    summary judgment, to explain it to a jury.

8          That was another thing.  That was not going to be an

9    easy thing to do, to explain RICO, racketeering.  Whether or not

10   a jury would believe that, you know, a bank such as Wells Fargo

11   would be engaged in, quote-unquote, racketeering activity, you

12   know, that was also, obviously, a risk that we faced.

13         THE COURT:  And how many witnesses did you have in

14   mind that you'd need to prove up your case?

15         MS. CLARK-WEINTRAUB:  Well, a lot of the case, I

16   think, would have turned on the expert testimony, in terms of

17   the analysis of the data especially.  I think in terms of fact

18   witnesses, probably, just guessing, between five and ten fact

19   witnesses potentially.  And then there would be experts; experts

20   on mortgage servicing, experts on the data analysis.  And, you

21   know, if the case had gone on, I think there probably would have

22   needed to be some sort of a forensic accountant to help us trace

23   through the payments, if ultimately we believed that was even

24   possible at the end of the day.

25         THE COURT:  One of the things you mentioned in the

1  papers was the difficulty of explaining this process to a jury,

2  or, for that matter, the judge, is complex --

3          MS. CLARK-WEINTRAUB:  Uh-huh.

4          THE COURT:  -- and therefore that would seem to weigh

5  in favor of the settlement, and yet the other point is that you

6  reviewed all of the complex documents.

7          MS. CLARK-WEINTRAUB:  We did.  Other than the data,

8  obviously.  I mean, the lawyers did not, you know, parse through

9  the data.

10          THE COURT:  Right.

11          MS. CLARK-WEINTRAUB:  I mean, I took the deposition of

12  Mr. Rittenhouse on the data, and it was, you know, hard to do.

13          THE COURT:  Okay.

14          MS. CLARK-WEINTRAUB:  I mean, it was hard to follow

15  through on everything.  You know, obviously, the witnesses --

16  and I'm not saying they weren't trying to be helpful.  I think

17  they were forthright, the witnesses from Wells Fargo, in their

18  testimony, but they, you know, speak sometimes as lawyers do

19  too, you speak in the jargon of your profession, and you have to

20  get behind that.

21          THE COURT:  Right.

22          MS. CLARK-WEINTRAUB:  And it's not easy.

23          THE COURT:  Okay.  Do you have anything else you want

24  to --

25          MS. CLARK-WEINTRAUB:  Well, I don't know if Your Honor

1  wants me to go through the Van Horn factors.  I mean, I think

2  we've talked about a lot of this now, and, obviously, it's all

3  set forth in our papers, why we believe the --

4          THE COURT:  When you say the Van Horn factors, refresh

5  my -- I know it's Van Horn vs. Trickey, but I don't remember

6  what the factors are.

7          MS. CLARK-WEINTRAUB:  Yes, Your Honor.  Well, you

8  know, balancing or weighing the merits of the case against the

9  terms of the settlement, I think we've talked about that already

10 and why the plaintiffs --

11         THE COURT:  Right.

12         MS. CLARK-WEINTRAUB:  -- believe that this was a

13 beneficial settlement for the class.  That's the first and,

14 according to the Eighth Circuit, the most important of the

15 Van Horn factors.

16         The second one is the defendants' financial condition,

17 which is, we believe, a neutral factor here because, obviously,

18 Wells Fargo could have paid more money, but also they could have

19 continued to litigate and they could have continued to litigate

20 through summary judgment, through trial, through appeal, and so

21 that obviously --

22         THE COURT:  Right.

23         MS. CLARK-WEINTRAUB:  -- increases the expense and the

24 risk of the litigation.

25         The third factor we just discussed, I think, which is

1 the complexity and expense of further litigation.  As I said a

2 little bit earlier, at the point the settlement was reached

3 while merits discovery was coming to a close, we were about to

4 get into the expert discovery phase, and, obviously, experts are

5 very expensive --

6          THE COURT:  Right.

7          MS. CLARK-WEINTRAUB:  -- in analyzing the data.

8          THE COURT:  You know, the only experience that I've

9 had that comes close to me or any other layperson understanding

10 this is I had an insider trading case in, of all places, the

11 Southern District of Iowa.  The Government -- it was a criminal

12 case.  The Government brought an expert from the University of

13 Michigan School of Business to try to explain to the jury what

14 an option was -- and the judge what an option was.

15          So in this case would your side, as well as the Wells

16 Fargo side, would you put on experts that would show the jury

17 what -- that the plaintiff was always in paid status and yet was

18 dinged with erroneous appraisal fees?  What's the expert testify

19 here for the plaintiffs?

20          MS. CLARK-WEINTRAUB:  Well, I think there would have

21 been a couple of -- at least several issues that experts would

22 have testified on.  They would have testified on what were the

23 industry practices with respect -- what practices had mortgage

24 servicers in general followed with respect to inspecting

25 properties and assessing their costs.

1          THE COURT:  That's what your side puts on?

2          MS. CLARK-WEINTRAUB:  I think both sides would put

3    that on.

4          THE COURT:  Both sides.  What the general industry

5    practice is --

6          MS. CLARK-WEINTRAUB:  Practices were.

7          THE COURT:  -- about being secure with your

8    collateral?

9          MS. CLARK-WEINTRAUB:  Right.  What the GSE guidelines

10   would require, what the investor -- you know, private investor

11   guidelines, you know, because all these mortgages now are sold

12   into, you know, MBS certificates.  You know, they're sliced up

13   and sold and so, you know, some are sold to these, you know,

14   GSEs like Fannie Mae, Freddie Mac.  Others are held by private

15   investors.  So, you know, what the guidelines were that Wells

16   Fargo was operating under or thought it was operating under,

17   there would have been expert testimony on that.

18          There were even conflicting merits expert reports in

19   the record at the time the settlement was struck between

20   Mr. Hamm and our expert, Christopher Wyatt, concerning, you

21   know, what the guidelines required and what was the usual

22   practice in the industry, so that was a point of contention

23   between the experts.  And, obviously, a battle of the experts,

24   you know, the jury can go either way.

25          As I said, I'm pretty sure if the case had proceeded

1   we would have had to have had some sort of a forensic

2   accountant, you know, piece through the records and trace

3   through payments to show, you know, what codes -- and a lot of

4   this testimony was going to be about coding, right, that

5   appeared in this data, you know, because there were various

6   codes and accounts that the fees flow through in order to be

7   paid on Wells Fargo's system and to be posted to the borrower's

8   mortgage account.

9         So it was going to be a lot of tedious testimony about

10  coding from experts, and we would have had an expert that would

11  have added up all the charges and said this is what we think the

12  damages are, and I'm sure Wells Fargo would have had their own

13  expert to add it up, and they would have come to a much lower

14  number.

15        I mean, even in the mediation, you know, how much the

16  charges actually added up to was a point of contention between

17  the parties because Wells Fargo had legal arguments it was

18  making as to why, even if a payment had been post -- I'm

19  sorry -- even if a fee had been assessed to the account, for

20  example, if it had been rolled up in a loan modification, Wells

21  Fargo argued that, you know, the borrower had ratified the fee

22  and therefore they would no longer have a claim to get that fee

23  back.  So, you know, those kinds of arguments, you know,

24  obviously reduce the damages number, sometimes substantially.

25        So there would have been, you know, expert testimony

1   about all of those issues from both sides, and probably the

2   expert testimony would have dominated the trial, because I think

3   from a factual standpoint there weren't a lot of disputes about

4   what Wells Fargo actually did at certain points in time.  I

5   mean, it had its policies and its procedures, and it implemented

6   them.  The issue is, you know, again, were they unreasonable,

7   did they rise to the level of, you know, a RICO violation.

8           THE COURT:  Okay.

9           MS. CLARK-WEINTRAUB:  That was the point of

10   contention.

11           THE COURT:  Ms. Clark-Weintraub, here's what I would

12   suggest.  On the fourth factor, which as I understand it is the

13   amount of opposition to the settlement --

14           MS. CLARK-WEINTRAUB:  Yes.

15           THE COURT:  -- which you've already recited in the

16   record here we have 13 objectors, 219 excluded people, and I

17   want to hear from them because I think --

18           MS. CLARK-WEINTRAUB:  Uh-huh.

19           THE COURT:  -- that's a necessary part of the process,

20   but why don't we not address that right now --

21           MS. CLARK-WEINTRAUB:  Okay.

22           THE COURT:  -- until I hear from the objectors.  Why

23   don't I hear from Wells Fargo and what they say about the

24   proposed settlement, and then you can come back once I hear from

25   the objectors.

1          MS. CLARK-WEINTRAUB:  Okay.

2          THE COURT:  Because I do have some other questions.

3          MS. CLARK-WEINTRAUB:  Sure.

4          THE COURT:  Mr. Lonergan, did you want to proceed or

5    is it Ms. Snavely Saelao?

6          MR. LONERGAN:  I'll be addressing the Court, Your

7    Honor.  Thank you.

8          THE COURT:  Thank you.

9          MR. LONERGAN:  I recognize that the parties have

10   submitted voluminous filings for the Court's consideration, and,

11   of course, class counsel has given, I think, a very

12   comprehensive overview of the settlement, the litigation, and

13   the various factors, so I will try not to repeat anything that I

14   think the Court has read or heard, but there are a couple of

15   points I think are worth emphasis from our perspective, Your

16   Honor.

17          First, and I think foremost, because it does directly

18   relate to the settlement's approval process, it is Wells Fargo

19   Bank's contention now and has always been that it has very

20   strong defenses to this lawsuit, both on the merits and with

21   respect to the maintenance of class certification.

22          Your Honor, I think correctly, summarized the gist of

23   the lawsuit.  This is about property inspections that Wells

24   Fargo indisputably ordered when loans were in default.  As the

25   Court knows from this hearing and other hearings we've had in

1  front of Your Honor, the basic practice is Wells Fargo would go

2  out and order inspections from a third party.  Typically those

3  were 15 or 20 dollars.  It passed through that charge to

4  borrowers pursuant to the contractual authorization, did not

5  mark them up.  This is not a mark-up case.

6         Probably the best source of information if the Court

7  wants to look at what the bank's defense is and would have been

8  if this case went to trial in terms of why this is a perfectly

9  legitimate, reasonable, universally followed practice among

10  mortgage servicers would be the expert report of Dr. Hamm that

11  has been mentioned several times, and that's found in Docket

12  158-14.

13         It's lengthy.  I think it's very helpful, and I won't

14  go through it in detail, but Dr. Hamm sets forth how, why

15  servicers do this, why you go out and inspect a property when

16  the loan is delinquent.

17         He goes through the reasons for it; the risk

18  avoidance, the guidelines that are published by

19  government-sponsored enterprises like Fannie and Freddie that

20  mandate this, the requirements of private servicers that mandate

21  this.  He goes through the serious risk of loss to servicers if

22  they don't inspect properties.

23         He goes through some of the local ordinances and laws

24  throughout the country, many of which have sprung up since the

25  great recession started in 2008 that legally obligate servicers

1  to do what was done here to protect communities from blight.  It

2  actually is not only very --

3          THE COURT:  My recollection is that there are also

4  government, city, county, state demands on mortgagers,

5  mortgagees to secure their property?

6          MR. LONERGAN:  Absolutely.  They've been sued.

7          THE COURT:  Right.

8          MR. LONERGAN:  Municipalities have literally brought

9  lawsuits against servicers for not inspecting enough.  And

10  Ms. Clark-Weintraub is absolutely correct that explaining this

11  to the jury and why this is so important and everyone does this

12  and must do this --

13          THE COURT:  That's one of your primary defenses?

14          MR. LONERGAN:  Absolutely.

15          THE COURT:  Okay.

16          MR. LONERGAN:  And it would have been at trial.

17          THE COURT:  Right.

18          MR. LONERGAN:  And we continue to believe that the

19  bank's practices were in all respects appropriate and lawful.

20          It's also true, as Ms. Clark-Weintraub pointed out,

21  that the bank contends and would contend that ordering

22  inspections, far from being a profit center from the bank, is a

23  huge loss item; that the basic practice is for as many property

24  inspections as are ordered and paid for out of pocket by Wells

25  Fargo and charged to the borrower, substantial percentages of

1  them are never paid, borrower never pays for them, and often, as

2  the data show, the loan goes into default and it's just a loss

3  for Wells Fargo.

4         So it's not a case that, I think, from our

5  perspective, there was any meaningful opportunity of ever

6  convincing a jury that this was a profit center.  This was a

7  loss for Wells Fargo.  It had every incentive to not order

8  property inspections but was legally and contractually required

9  to do that.

10        I won't go through specific analysis of the claims.

11 Your Honor has heard from us about that before in connection

12 with past motions.  But I will point out something that I think

13 is highlighted in both sides' papers.  There have been, I think,

14 some significant developments recently, meaning last year, 2015,

15 that cast considerable doubt on the continued viability of these

16 claims.

17        Your Honor asked a question about whether other

18 servicers were involved in similar litigation.  I think class

19 counsel are correct this is probably the first filed suit, but

20 it's not the only lawsuit, and, as we point out in our papers,

21 there was a case against Bank of America, very similar property

22 inspection case, that last year the RICO claim was dismissed

23 because the court concluded, and concluded correctly, that you

24 don't have a RICO -- there's no common purpose between the

25 servicer that passes on charges to the borrower and these

1   third-party vendors that inspect properties for a fee.  There's

2   no common purpose to support a RICO violation for defrauding or

3   misrepresenting charges, so that claim was dismissed.

4           We think there was certainly a significant possibility

5   that given that authority Your Honor would reconsider that

6   issue, and we would urge -- would have urged that result here.

7           Further, with respect to class certification, Your

8   Honor will recall our position on that when that was argued was

9   that whether or not a particular inspection was or was not

10  reasonably necessary to make sure the property continues to be

11  in good condition is inherently an individual issue.  You cannot

12  decide across the board for 2.7 million loans and millions of

13  inspections every one of them was, you know, unreasonable or

14  reasonable.

15          Confirming, I think, our view on that, just last year

16  in some litigation that we're familiar with in the Northern

17  District of California, Judge Yvonne Gonzalez Rogers denied

18  class certification of two almost identical property inspection

19  class action lawsuits against Chase and Citibank, and that is

20  certainly something that we would have brought to the Court's

21  attention and urged Your Honor to revisit certification, as

22  you're entitled to do at any point up to judgment.

23          THE COURT:  Is that on appeal?

24          MR. LONERGAN:  It is not on appeal at this point.

25  Maybe at some point, but not now.  Those rulings were relatively

1    recent, I believe in December.

2          THE COURT:  Okay.

3          MR. LONERGAN:  Also illustrating, I think, the risk

4    here, the focus, as Ms. Clark-Weintraub points out, particularly

5    late in the case, had to do with data and damages.  There are --

6    the parties exchanged a lot of information about data and

7    damages, and there were -- you know, had very different

8    viewpoints about how much -- assuming liability, how much could

9    be made out by the plaintiffs in terms of a damage case.

10          There was a full disclosure of the entire loan-level

11   database for all these borrowers to class counsel so that they

12   could analyze it along with their experts.  The parties

13   exchanged positions over a continuum -- a considerable period of

14   time about their different positions.  I won't go through all of

15   them, but there were a lot of disputes about what actually could

16   be damage that could be recovered from this.

17          Ms. Clark-Weintraub has pointed out the difference

18   between initial inspections and subsequent.  It is certainly

19   Wells Fargo's contention that the initial -- an initial

20   inspection when a loan is in default, the idea that we can't

21   send someone to drive out to the property and see if it's in

22   good condition even one time is something that we would have

23   strenuously disputed, and there's a lot in the data about

24   initial versus subsequent.

25          The Court has heard something about loan

1  modifications.  Just to make clear, a lot of these loans,

2  because the borrowers were in default -- and I don't have the

3  percentage at the fingertips, but it's significant -- were

4  modified.  Wells Fargo agreed to the borrower's request to write

5  down the loan balance or adjust the interest rate.

6         As part of that process, and understandably so, I

7  think, the bank enters into an agreement with the borrower that

8  says, okay, you and we agree that on this date your loan balance

9  is X, and if there's a property inspection fee that's rolled

10  into there, it's in there, and there's an explicit waiver of any

11  claims about that balance.

12         So it certainly would have been our contention at

13  trial -- I'm sorry.  The Court --

14         THE COURT:  No.  I was just going to say but those

15  people you've described, and I'll take it as being active loans

16  and paid in full, they're not going to get paid for that.

17  They've waived any claim, haven't they?  They're not going to

18  get paid?

19         MR. LONERGAN:  They will get paid for those.

20         THE COURT:  They will get paid even though they, when

21  you say, modified the loan?  Oh, okay.  I didn't think they'd

22  get paid so that's my misunderstanding.

23         MR. LONERGAN:  I'm not explaining it clearly.  Let me

24  take a shot at it.

25         THE COURT:  Yes.

1           MR. LONERGAN:  So an example would be a borrower is --

2    their property's inspected, they're assessed a $15 fee.

3           THE COURT:  Right.

4           MR. LONERGAN:  They don't pay it, as many of them

5    don't.  Somewhere down the road loan modification discussions

6    begin, and the bank agrees to the customer's request to write

7    down the loan balance, say from 300,000 to 250 or whatever it

8    may be, and on a certain date the parties agree, "This is the

9    balance you owe, 250.  This will be your payment schedule going

10   forward."

11          THE COURT:  Right.

12          MR. LONERGAN:  Arguably, the unpaid property

13   inspection fee has been rolled in there, it's part of that 250.

14   The written agreement between the parties says, "We agree this

15   is the balance owing on this date."

16          THE COURT:  Right.

17          MR. LONERGAN:  Had this case gone to trial, we would

18   have stood in front of a jury and said all of those individual

19   fees that were rolled in, they can't be challenged.  Because we

20   agreed to modify and write down the loan --

21          THE COURT:  Okay.

22          MR. LONERGAN:  -- they are bound by that.  They cannot

23   now contest that fee in the context of this class action, so

24   they have to be carved out.  As part of the settlement, they're

25   not carved out.

1          THE COURT:  Right.  It seems to me that aren't they

2  getting a windfall?

3          MR. LONERGAN:  They're not getting a windfall.

4  They're getting compensation that, you know, it's not the most

5  compensation they could get if they win every argument, but

6  they're getting entitlement to be compensated for that fee, even

7  though we had a defense we would have raised.

8          THE COURT:  Okay.  I apologize for interrupting.  I

9  wanted to make -- I didn't understand the modified loan and how

10  they'd still get paid, but you've explained it now, I think.

11          MR. LONERGAN:  So that would have been a contentious

12  issue with respect to the damages sought on behalf of the class.

13  There were contentious issues about waivers.  The data show many

14  different credits but don't necessarily clearly articulate every

15  case why there's a credit to a balance.  We contended that many

16  of them are waivers; Plaintiffs' experts contend otherwise.

17          And certainly the biggest dispute is over whether

18  dollar amounts were paid, whether they were paid by customers or

19  whether, particularly with respect to loans that already went

20  through foreclosure, the records might reflect a credit, but

21  there was a big dispute about whether that was actually a

22  customer payment or it was the third-party investor or a GSE

23  payment.

24          So the damage issues in this case were very, very --

25  would have been very, very contentious.  And certainly I hear

1  class counsel's estimate of the damages they thought they'd be

2  able to recover.  I'm sure it will come as no surprise to the

3  Court that the bank's contention would have been it was far less

4  and therefore that the settlement is --

5           THE COURT:  The figure that appeared, Mr. Lonergan,

6  the figure that appeared, was that their figure about what the

7  maximum exposure was?

8           MR. LONERGAN:  Yes.

9           THE COURT:  Did you have any of your own?

10          MR. LONERGAN:  Well, we had different alternatives

11  depending on certain legal arguments, but fair to say that at

12  trial Wells Fargo would have contended that any damages

13  recoverable by the class would have been far less than 100

14  million, far less.

15          THE COURT:  Okay.

16          MR. LONERGAN:  A couple of other -- those were the

17  main points I wanted to make as to why we have always believed

18  that what the bank did was legitimate and defensible and it

19  could be defended and why the settlement that was reached is

20  eminently fair and reasonable to members of the class.

21          There were a couple points that came up in Your

22  Honor's conversation with class counsel that I will address

23  because they seem like they are of some interest with the Court.

24          I agree with class counsel that the likely length of

25  trial would probably have been, from our perspective, in the ten

1    court day range.  It is true that the presentation would have

2    included experts from both sides to talk about the process

3    because I think, you know, servicing of mortgage loans and why

4    banks go out routinely and inspect properties, how important it

5    is to reducing risk and urban blight and everything else, is

6    beyond the common experience of most jurors who aren't in that

7    line of work, so we would --

8            THE COURT:  Especially if they've seen The Big Short.

9            MR. LONERGAN:  Fair enough, Your Honor.

10           THE COURT:  Yeah.

11           MR. LONERGAN:  So we would definitely have done that

12   to try to take the complex but important process and make it --

13   present it in understandable terms.

14           But we would have done something else that I want to

15   mention, and I believe I tried to explain this to the Court at

16   class certification.  This debate that raged on during this case

17   about whether or not it's necessary to conduct a property

18   inspection is really happening in the abstract.  We would have

19   brought in witnesses to try to make it real and deal with real

20   people and real loans.

21           We would have brought in the folks who managed this

22   process from Wells Fargo or property inspectors or maybe even

23   actual homeowners that are in the class to illustrate to the

24   jury how quickly a loan can change; how you can have a loan

25   that's in default, you go inspect it one day and it looks like

1   it's in good condition and it's occupied and all that, and you

2   go out there 30 or 35 days later and it's vacant and all the

3   copper pipes are ripped out of the house and there are squatters

4   living in the house and everybody on the block is afraid to

5   drive by the house anymore.

6          This case and this trial would have needed a real-life

7   illustration of what has been going on out there over the class

8   period in the real world that drives the need for inspections

9   separate and apart from GSE regulations and loan servicing

10  standards, and we would have endeavored, with Your Honor's

11  permission, to present that evidence to the trier of fact.

12         The last point I would make has to do with the fate of

13  any unclaimed funds.  I agree with class counsel this isn't

14  really what I think class action lawyers think of as a

15  traditional cy pres case.

16         This is not a case where we know there's a big loss

17  that was claimed but a lot of these people can't be found so we

18  have to figure out what to do with the money.  This money is

19  going to be directly distributed to people that we have their

20  addresses, and some of them have to submit claims and others

21  don't.

22         THE COURT:  Right.

23         MR. LONERGAN:  Checks are going to go out, and then

24  there's going to be some amount of money from checks that are

25  not cashed.  We know that.  Then there's going to be a second

1  distribution to these people to get that money out there to go

2  directly to the people that were affected by the process, and

3  only after that second distribution, where there will probably

4  be some remaining amount of money which will not be significant,

5  I think, in the grand scheme of the total pot here, then and

6  only then will that final residue not go back to Wells Fargo --

7  that was something that class counsel were not willing to agree

8  to -- but will go to -- it's not just the United Way; it was

9  targeted to financial education programs of United Way.

10        And if you look at Judge Bucklo's article and her

11 discussion of, you know, cy pres recipients, I am very

12 comfortable that the agreed upon designation fits this class of

13 people; these people, they're groups of folks who are not able

14 to pay their mortgage, who went in default, who had, you know,

15 repeated inspections, and this is -- these programs by the

16 United Way are intentionally designed to help consumers like

17 that avoid trouble in the future and stay out of similar

18 situations.

19        So we feel, and I think class counsel agreed, that's

20 why it's in the settlement agreement, that this is a recipient

21 for what will be a small percentage of money that really is

22 reasonably tailored to the claims in this litigation.

23        THE COURT:  Mr. Lonergan, I want to know, why on the

24 third group, which I'll call the post-sale --

25        MR. LONERGAN:  Uh-huh.

1          THE COURT:  -- doesn't Wells Fargo have documentation

2  about the fees that have been paid by that group and why do we

3  need the claim form?  I mean, it's probably obvious, but I don't

4  understand it, so --

5          MR. LONERGAN:  Well, it's probably not obvious.  It is

6  complex, and I'll try to explain it, Your Honor.  And this was

7  actually part and parcel -- it was a point of considerable

8  discussion between the parties.

9          The essential thing that I think is helpful to

10  understand that is initially when a property goes into default

11  there is a fee charged and it's in a certain category called Fee

12  Code 4.

13          THE COURT:  Called what?

14          MR. LONERGAN:  Fee Code 4.  It's just a code within

15  the servicing system.

16          THE COURT:  Okay.

17          MR. LONERGAN:  And it's a separately designated

18  category where you can see the charge assessed, and if the

19  customer comes in and pays it or sends in a check, you can see

20  that it's paid.

21          But as the loan gets further and further into

22  delinquency, there is a recognition by the bank internally that,

23  you know, it's looking like this customer is not likely to bring

24  their loan current, meaning they're not likely to pay these

25  property inspection fees, so at that point the fees are then

1   assessed to a different category called corporate advance.  Your

2   Honor may have seen that in the papers.

3          A corporate advance account doesn't just include

4   property inspection charges; it includes many other types of

5   charges that typically would get assessed to a seriously

6   delinquent borrower.  The charges are all commingled in the

7   system, so you might have a $15 property inspection fee and an

8   attorney fee charge and a winterizing charge or whatever it is.

9   It all goes into a bucket and it gets commingled.

10          Once it gets commingled, it becomes very difficult to

11   look into the records and see where there might have been

12   credits to the account, and therefore it becomes very difficult,

13   for the seriously delinquent and foreclosed borrowers to say,

14   yes, I think they paid that $15 charge, or, no, they didn't.

15   That would have been -- was and would have been a very

16   contentious issue between the parties.

17          In addition, especially for foreclosed borrowers, even

18   where there were credits to these charges, a lot of those were

19   done after the foreclosure happened, not from a borrower payment

20   but from the investor coming in or Fannie Mae or Freddie.  So

21   even where there's credits, you can't tell if the borrower paid

22   it or not.

23          And anecdotally, we believe -- and I don't want to

24   speak for class counsel, but I don't think they dispute this --

25   that for foreclosed borrowers, a very, very, very small

1   percentage of these people ever came forward and paid it.  The

2   loan just went delinquent and they were never paid, so we would

3   have --

4          THE COURT:  So it's been commingled is the reason we

5   have a claim form because the burden is on the class member to

6   show affirmatively that they paid, even if they're now

7   foreclosed on, short sale or otherwise?

8          MR. LONERGAN:  That's correct.

9          THE COURT:  Okay.

10          MR. LONERGAN:  Unless Your Honor has any further

11   questions, that would be my --

12          THE COURT:  Mr. Lonergan, I don't mean by this

13   question to suggest that, you know, these -- I get very worried

14   because I think that the Congress and Supreme Court, in that

15   rule enabling, permitting class actions -- the public, in my

16   view, is too cynical about this.  They think that there's not a

17   basis for it.  But I'm going to assume that none of you lawyers

18   here in the courtroom have ever gone to verdict on a class

19   action.

20          MR. LONERGAN:  That is not correct.  I have, Your

21   Honor.

22          THE COURT:  Okay.  And I'm not being critical, and I

23   want to hear from you, Mr. Lonergan, because I've never had a

24   lawyer that went to verdict on one of these.  I've probably had

25   four or five approvals.  And that's not unusual.  I think the

1    status from the FJC tell us that 2 percent of cases go to

2    verdict anyway.

3              So but you can speak, having gone to verdict,

4    Mr. Lonergan, in a way that, perhaps, I can better understand

5    the complexity aspect, the Van Horn, the third factor.

6              Tell me about your work on this because I've never had

7    a lawyer like you before that's gone to verdict on these cases

8    because I assume they have a tenor all of their own that perhaps

9    if you've gone through it you understand it better than someone

10   who hasn't.  Is that right or not?

11             MR. LONERGAN:  Well, I think I have some

12   understanding.

13             THE COURT:  Okay.

14             MR. LONERGAN:  I've taken three class actions to a

15   verdict.

16             THE COURT:  All right.

17             MR. LONERGAN:  They are complicated, complex cases to

18   try.  The accounting issues, as is true in this case, are

19   frequently very, very complicated and difficult and contentious.

20   This case would definitely have been of that category.

21             To state the obvious, there's substantial risk for a

22   defendant.  Your Honor knows that.

23             THE COURT:  Okay.

24             MR. LONERGAN:  Class counsel know that.  That's why a

25   lot of these settle.  But they can be won from a defense

1  standpoint.

2          THE COURT:  Okay.

3          MR. LONERGAN:  And I'm fortunate enough, knock on

4  wood, the ones that I've been involved in, the client has been

5  successful.

6          THE COURT:  Can they be won from the plaintiffs'

7  standpoint?

8          MR. LONERGAN:  Sure.  Sure, they can.  That's why

9  we're settling the case.

10          But ultimately, my experience, you know, I think

11  jurors are common sense folks, and I think when -- my experience

12  is when a trial begins, there seems to be a feeling from jurors,

13  and maybe even from judges, "This is a class action.  There must

14  be something here.  It's important.  There's a lot of money at

15  stake."

16          THE COURT:  Right.

17          MR. LONERGAN:  "This case wouldn't have gotten that

18  far."  And that's a natural inclination for all of us.

19          But I think at the end of the day, even in a class

20  action, when you go through and explain, you know, what the

21  dispute is, I think jurors are open-minded and fair and they'll

22  judge it on the merits.  And I think that the juries here in

23  Des Moines would have done that in this case had it gone to

24  trial, and we felt confident, but we recognize the risk, and we

25  think this is a fair resolution.

1          THE COURT:  Okay.  Anything else you want to tell me?

2          MR. LONERGAN:  Nothing that I can think of, Your

3    Honor.

4          THE COURT:  All right.  Thanks very much.

5          MR. LONERGAN:  Thank you.

6          THE COURT:  The only lawyer I saw who filed

7    representing one of the objectors, Mr. Harding, I don't see him

8    here.

9          But you objectors know who you are and I don't.  So I

10   want to give you every opportunity to tell me about your

11   objections.  Even if your filings were not timely, I want to

12   hear from you, so speak now or -- you know, come forward, and

13   you can tell the Court and the lawyers your objections to this

14   so they can hear it in open court.  You're entitled to that.

15   You shouldn't feel intimidated by the process.

16         Yes, sir.  Please come forward.  And you can use the

17   microphone there, and why don't you begin, for our reporter and

18   for our record, just state your name.

19         MR. NJEMA:  Yes.  My name is Kenneth Njema.  I have a

20   matter in Minnesota District Court.  It's Njema vs. Wells Fargo.

21   It is a matter concerning trespass and other claims in a matter

22   too, but the trespass has some value to somebody.

23         THE COURT:  And for the lawyers, because they

24   should -- they perhaps they don't know, you made a filing just

25   this morning, didn't you?

1          MR. NJEMA:  Yes, I did.

2          THE COURT:  It appeared on my CM/ECF.

3          MR. NJEMA:  Yes.

4          THE COURT:  Well, the lawyers probably don't know

5    that.  So does your filing set out in general the sum and

6    substance of what you're going to tell the Court and the

7    lawyers?

8          MR. NJEMA:  I'll try my best.

9          THE COURT:  I'm sorry?

10          MR. NJEMA:  I'll try my level best.

11          THE COURT:  All right.  Okay.

12          MR. NJEMA:  The reason I'm objecting to the proposed

13    settlement is not because I don't think there should be a

14    settlement but because I think that because -- because I think

15    that the settlement terms are unfair at this time.

16          We're talking about property inspections, a lot of

17    them which were unreasonable inspections, which a lot of times

18    ended up, you know, constituting trespass.  And so we do -- I do

19    agree with Wells Fargo counsel that I agree that it's -- the

20    bank is entitled to making the inspections to ensure there is no

21    vandalism and to make sure that they're protecting their

22    interest, but my contention is a lot of times the way they

23    handled the inspections.

24          The way they conducted the inspections was a problem

25    because a lot of times before they conducted the inspections,

1  their vendor would send out a notice asking you to call him to

2  let him know that whether you live in that property or not, and

3  so a lot of times I ended up calling and letting them know that

4  I'm still living at the property, but as a matter of fact, there

5  are times when I would call the bank and still call the banker,

6  and then a week later, they would come to the property and lock

7  you out.  So the problem is the property inspections, the way

8  they were conducted, not the public is contesting whether the

9  bank has the rights to do this.

10         One other reason for the objection is the amount set

11  aside right now for taking care of the class members.  In my

12  opinion, it's not an adequate amount because like, for example,

13  in the loan that I'm talking about here in Minnesota, the

14  average fees come to around $200 per inspection.

15         Now, the money that's set aside for this settlement

16  fund, if you divide it up among the 2.7 class members, you know,

17  after deducting the attorney fees and, you know, claim

18  administrator fees, they're probably -- there's probably maybe 5

19  to 10 dollars left for each class member.

20         And, now, we have an agreement here today that each

21  inspection was at minimum $15, so if people are trying to get

22  some kind of remedy from this class action, obviously, they're

23  not going to be able to get a remedy because the money they

24  would get back from the class action is not even enough to cover

25  the fee that they were charged in the first place.

1           And so what I did today, what I've been trying to

2   do -- and I understand that, you know, it doesn't help the late

3   issue at this point -- is I'm trying to find a way to enjoin

4   trespass as a subclass in this class action lawsuit because like

5   the counsels here have agreed, this is probably the only class

6   action lawsuit that I'm aware of in the nature of today that --

7           THE COURT:  Can I ask you a question?  First of all,

8   how do I pronounce your last name?

9           MR. NJEMA:  Njema.

10          THE COURT:  My understanding is you have a pending

11  claim in the District of Minnesota, according to your filing and

12  what was told me earlier.  Is that correct?

13          MR. NJEMA:  Correct.

14          THE COURT:  And is it against Wells Fargo?

15          MR. NJEMA:  Yes, it is.

16          THE COURT:  It alleges trespass?

17          MR. NJEMA:  Yes.

18          THE COURT:  Judge Schiltz has the case?

19          MR. NJEMA:  Yeah.  Because it's still there.  It's

20  still pending.  We're supposed to be going to trial, and I don't

21  have an attorney to handle this.

22          THE COURT:  And you make reference in your filing

23  here -- and I'm on page 2 of your filing.  You're not making any

24  claim on behalf of another person?  You reference a Sonia

25  Shelton.

1           MR. NJEMA:  Yeah.  What I'm talking about is I --

2           THE COURT:  Let me just confine your answer to that,

3   if you could.  Are you making a claim on behalf of another

4   person?

5           MR. NJEMA:  Yes.  She's a class member.

6           THE COURT:  Okay.  You can't do that.  Are you a

7   member of the bar?

8           MR. NJEMA:  No, I'm not.

9           THE COURT:  Okay.  You can make your own claim --

10          MR. NJEMA:  Okay.

11          THE COURT:  -- but I don't think the law permits me to

12  recognize you as a representative of another person, okay?

13          MR. NJEMA:  Okay.

14          THE COURT:  You understand that, don't you?

15          MR. NJEMA:  Yes, I do.

16          THE COURT:  Okay.  Did you want to tell me anything

17  more about your claim here?  Because I don't think you're a

18  member of this class, unless I have missed something.  Are you a

19  member of this class?

20          MR. NJEMA:  Yes, I am.  Yes.

21          THE COURT:  Okay.  Did you hold a mortgage between the

22  2004 and 2013 -- I may have the dates wrong -- time period?

23          MR. NJEMA:  Yes, I did.

24          THE COURT:  Okay.  And were you sent a late or a

25  drive-by appraisal charge?

1            MR. NJEMA:  Yes.  Yes, I do.  Actually, I have it.

2            THE COURT:  And so you'll likely be paid because is

3 your loan foreclosed on or is your loan an active one or what is

4 your loan?

5            MR. NJEMA:  It's foreclosed on right now.

6            THE COURT:  I'm sorry?

7            MR. NJEMA:  Foreclosed on.

8            THE COURT:  Foreclosed on.  So you may get paid.  Do

9 you understand that?

10            MR. NJEMA:  Okay.  Yes, I do.

11            THE COURT:  Okay.  Tell me any other objections you

12 have to the settlement because I'll treat your filing here --

13 and I'll address those in my order either rejecting the

14 settlement or approving it, but I want to make certain that you

15 feel that you've been fully heard on any other bases.  So if

16 there's something beyond what you've submitted in writing,

17 please tell me that.

18            MR. NJEMA:  That's it.  There's nothing else.

19            THE COURT:  All right.  Thanks so much.

20            MR. NJEMA:  Thank you.

21            THE COURT:  Ms. Clark-Weintraub or Mr. Lonergan, I'm

22 assuming that you don't have any examination or questions of the

23 objector, but if you do, I certainly want to give you the

24 opportunity to examine.

25            MR. LONERGAN:  None from Wells Fargo, Your Honor.

64

1          MS. CLARK-WEINTRAUB:  No, Your Honor.

2          THE COURT:  All right.  Are there any other objectors

3   here that want to be heard?

4          No?  Okay.

5          Ladies and gentlemen, we're going to take a recess.

6   We'll reconvene at 20 minutes to 12.

7          (Recess at 11:25 a.m. until 11:40 a.m.)

8          THE COURT:  Please be seated.

9          Counsel, I don't think there's any need to discuss the

10  fourth factor regarding the objectors based upon the record

11  we've had here today, but each of you may if you want to.  I

12  don't see any necessity to have any additional record made on

13  it, but perhaps you do.  That is the objectors and the

14  opposition to the settlement.  I told you I'd reserve that once

15  I heard from the objectors, so --

16          MS. CLARK-WEINTRAUB:  For the plaintiffs, Your Honor,

17  I don't think we have anything to add beyond what we've put

18  forth in our papers.

19          THE COURT:  All right.

20          MS. CLARK-WEINTRAUB:  I think Mr. Njema's arguments

21  here sort of repeat what's already been said.

22          THE COURT:  All right.

23          MS. CLARK-WEINTRAUB:  And the Court is aware he has a

24  transfer motion in front of the JPML, which we've opposed, by

25  the way.

1          THE COURT:  All right.

2          MR. LONERGAN:  And, Your Honor, Wells Fargo would

3   agree that we think it's adequately addressed in the papers.

4          THE COURT:  Okay.

5          MR. LONERGAN:  And I think in addition, the comments

6   made by both sides in oral argument in response to Your Honor's

7   questions address many of the same issues addressed already in

8   the objections.

9          THE COURT:  All right.  Thank you very much.

10          Now, Ms. Clark-Weintraub, judges are way out of touch

11   with what goes on in the private practice of the law, and so I

12   need some education here.  I think years ago, I think the

13   Hensley case said when you look at a fee application, it should

14   be as if the client -- you should look at it the way the client

15   would approach the necessity of specifying what was done.

16          So here is the first problem I have, and I want you to

17   tell me -- perhaps I don't understand the law here with regard

18   to class actions.  But generally, over seven years, I would

19   think an hourly rate would change, that it wouldn't remain the

20   same.

21          I have six different law firms here -- I'm sorry -- I

22   have seven different law firms here, beginning with Scott &

23   Scott, including Michael Reese, Kim Richman, Mario Pacella/Strom

24   Law Firm, Roxanne Barton Conlin, Howard Miles, and Todd Garber,

25   and I have hourly rates for those lawyers that are recited in

1    the papers that were submitted, but the hourly rate doesn't

2    change.

3              So perhaps there's a case or there's law that says,

4    well, you should treat the fairness of the fee request at the

5    time of the settlement or explain to me why the fee remains the

6    same from the outset of the lawsuit to today.

7              MS. CLARK-WEINTRAUB:  Yes.  The hourly rates probably

8    almost certainly changed over the years, but it is customary in

9    these cases --

10             THE COURT:  I bet they didn't go down.

11             MS. CLARK-WEINTRAUB:  Actually, I think mine may have

12   gone down when I switched firms, but I can't verify that.

13             THE COURT:  Okay.

14             MS. CLARK-WEINTRAUB:  But I think that it's customary

15   in these cases that the most recent hourly rate be used in order

16   to compensate counsel for the time, in part for the time value

17   of money.  Obviously, the case has gone on for a long time.

18             I'm not sure if we cited authority on that issue in

19   our brief.  I don't recall that we did, and so if Your Honor

20   wants us to provide additional authority on that point --

21             THE COURT:  That would be helpful to me because --

22             MS. CLARK-WEINTRAUB:  Okay.

23             THE COURT:  -- I just don't understand why the fee,

24   the hourly rate, did not change.  But, again, I've been out of

25   touch with the practice of law, and I like to think that I try

1  to understand that all this money doesn't go directly to you and

2  then to Mercedes-Benz, that you have to pay overhead and rent

3  and that kind of thing.

4          Then, Ms. Clark-Weintraub, could you break down for me

5  with some more specificity the expenses; the experts, what they

6  cost?  That's going to be very helpful to me in understanding

7  what you did and what the other lawyers did.

8          MS. CLARK-WEINTRAUB:  Yes, Your Honor.  We can do

9  that, and we can submit something on that.

10          THE COURT:  Okay.

11          MS. CLARK-WEINTRAUB:  I think it's fair to say that

12  the vast majority of the expenses went to the experts --

13          THE COURT:  Okay.

14          MS. CLARK-WEINTRAUB:  -- expert expenses, and then

15  probably after that costs of, you know, document discovery and

16  travel.  There was, obviously, numerous trips to and from

17  Des Moines for counsel --

18          THE COURT:  Okay.

19          MS. CLARK-WEINTRAUB:  -- to take depositions and/or to

20  appear in court.  And I think that is the vast majority of the

21  expenses.

22          Each of the fee declarations, you know, contains a

23  breakdown of each firm's individual expense amount --

24          THE COURT:  Right.

25          MS. CLARK-WEINTRAUB:  -- and has categories of, you

1  know, expense.  So, for example, looking at the amended

2  declaration of my partner, Daryl Scott, who is, just by way of

3  explanation, the CFO of our firm, so he handles all of the

4  expense issues, you can see that of the $86,944 in expenses

5  incurred by Scott & Scott, the vast majority were for

6  consultants, experts, travel.  Those were the three largest

7  categories, you know, followed by mediation and then some

8  miscellaneous amounts.

9          THE COURT:  Okay.

10          MS. CLARK-WEINTRAUB:  So but each fee declaration does

11  contain that kind of breakdown.

12          THE COURT:  All right.  I understand your 1318.6 hours

13  that you were co-lead counsel all phases of discovery,

14  depositions; lead role in drafting class cert motion, defending

15  Eighth Circuit appeal attempt; retain expert; mediations, but --

16  and I have Mr. Reese, who describes his work as discovery;

17  drafted opposition to motion to dismiss, motion for class cert,

18  motion for class approval; retained experts; mediation and

19  settlement.

20          The other firms, I have no idea what they did.  I've

21  got to have -- you've got to tell me what those lawyers did.

22          MS. CLARK-WEINTRAUB:  Sure.

23          THE COURT:  And here's what might be helpful.

24          MS. CLARK-WEINTRAUB:  Uh-huh.

25          THE COURT:  If you look at our local rule --

1          MS. CLARK-WEINTRAUB:  Uh-huh.

2          THE COURT:  -- it says that in post-judgment cases

3   that I look at where there's fee shifting to prevailing parties,

4   they break it down.  That local rule, 54.1, breaks it down.  We

5   ask the lawyers to tell us -- you know, I'm assuming there's

6   pre-filing investigation which isn't covered by our local rule,

7   but it says, one, drafting pleadings, motions, and briefs; two,

8   legal research; three, investigation; four -- that's

9   investigation after the suit was filed; four, interviewing.  The

10  next two don't show up because we have trial prep and trial.

11          So if I could have some indication for the benefit of

12  the class that's not here, because I want to set out in some

13  detail for the class, particularly the objectors.  More

14  importantly, I think, is transparency.  The utility of class

15  actions is recognized by the Congress and the Supreme Court, but

16  I'd like to give some credibility to the idea that the lawyers

17  earned their fee.  I can't do that without more detail.

18          MS. CLARK-WEINTRAUB:  Okay.

19          THE COURT:  And, you know, make a filing of some sort

20  so I can use it.  When lawyers tell me they did something, I

21  take it on faith that they did it unless it's just beyond the

22  pale, and I don't see anything at this submission that I think

23  would be of that type.

24          So I don't know if you have any comment on any of

25  that.

1          MS. CLARK-WEINTRAUB:  I don't, Your Honor.  Just for

2    clarification, would you like that breakdown just for the other

3    firms or do you want that for my firm and Mr. Reese's firm as

4    well?

5          THE COURT:  It would be helpful.  I mean, I assume

6    with software, with computers, that this is not -- I'm not

7    asking you to go back and --

8          MS. CLARK-WEINTRAUB:  Yep.

9          THE COURT:  -- go through a paper file.

10         MS. CLARK-WEINTRAUB:  Yes.

11         THE COURT:  So I assume it's available, I just don't

12   have it, and it's going to be helpful in addressing the

13   appropriateness of the fee.  I look at the lodestar.  The cases

14   tell me that it's a good check against the percentage of the

15   fund allocation that you're asking in this case so --

16         MS. CLARK-WEINTRAUB:  Yes.

17         THE COURT:  Do you have any other facts or law that I

18   ought to know about?

19         MS. CLARK-WEINTRAUB:  I think beyond what we've put in

20   our papers, I don't, Your Honor.  I think, you know, a lodestar

21   check is obviously something that the Eighth Circuit has

22   approved, and I think the lodestar check here supports the

23   reasonableness of the fee requests.  The multiplier is fairly

24   modest at 1.82, so it's less than a 2 multiplier.

25         So beyond that, if there's any other information I can

1  provide to Your Honor, obviously, I'm happy to do that.

2         THE COURT:  All right.  Okay.

3         MS. CLARK-WEINTRAUB:  Can I just make one -- and I

4  guess we can correct this in the papers, but in our reply

5  memorandum, we had indicated that we had had a downward

6  adjustment in the expense amount, the total expenses, because

7  Mr. Reese had been able to negotiate a discount on an expert

8  fee, a consulting expert fee, in the case.

9         THE COURT:  Okay.  I've got Document 285 that was

10  filed just the 15th.  Does that have -- this is called a

11  "Response to...Motion for Settlement."  Does one of those

12  documents tell me that?

13         MS. CLARK-WEINTRAUB:  Yes.  Yes.  In our reply brief,

14  which is 281-1.

15         THE COURT:  All right.

16         MS. CLARK-WEINTRAUB:  On page --

17         THE COURT:  This is Clark-Weintraub declaration in

18  support of final approval?

19         MS. CLARK-WEINTRAUB:  No.  This is the plaintiff's

20  reply memo, 281-1.

21         THE COURT:  Right.

22         MS. CLARK-WEINTRAUB:  On page 5, at the very top of

23  the page, there's a line stating that Plaintiffs' counsel have

24  advanced $204,792.06 in litigation expenses, and that's

25  footnoted to explain this reduction from the opening brief.

1          Actually, and it's my error, and I apologize, Your

2    Honor, that 204 number is slightly too low, and the actual

3    number is 211,042.  But we'll make that clear in our

4    supplemental submission, but I did want to apologize to the

5    Court for that.

6          THE COURT:  The other thing is you're going to tell me

7    who was deposed, who took the depo --

8          MS. CLARK-WEINTRAUB:  Yes.

9          THE COURT:  -- and when the depos were.

10          MS. CLARK-WEINTRAUB:  Yes.

11          THE COURT:  Any other record you need to make?

12          MS. CLARK-WEINTRAUB:  I don't believe so on the fee,

13    beyond what we argued in our papers, Your Honor.

14          THE COURT:  All right.

15          MS. CLARK-WEINTRAUB:  To follow up just briefly on the

16    exclusions, the late exclusions, at the break Mr. Lonergan

17    informed me that Wells Fargo will not oppose Your Honor

18    accepting the late -- the five late exclusion requests.

19          THE COURT:  All right.

20          MS. CLARK-WEINTRAUB:  So we wanted to let Your Honor

21    know that.

22          I think then that leaves -- does Your Honor want to

23    hear at all on the final certification of the class?  You know,

24    we think the class should be certified, you know, for all the

25    reasons set forth in our papers and for all the reasons the

1   Court previously found in granting class certification.

2          You know, we believe that the requirements of Rule

3   23(a) are easily met here; numerosity, commonality, typicality,

4   and adequacy, and also predominance under 23(b)(3).  So given

5   Your Honor's earlier findings and the opinion on class

6   certification, we don't think it's controversial, but I just

7   wanted to make a note that we are moving for final certification

8   of the settlement class.

9          THE COURT:  Right.

10         MS. CLARK-WEINTRAUB:  And the other issue, I guess, is

11  the request for service awards for the four plaintiffs.  We've

12  requested an award of $10,000 for each of the plaintiffs.

13         You know, the plaintiffs, you know, stuck with the

14  litigation for quite a while.  They produced documents, they

15  appeared for depositions, kept in contact with the lawyers, and,

16  obviously, if the case had continued, you know, there was

17  outstanding discovery directed to the plaintiffs from Wells

18  Fargo that would have had to have been responded to.

19         So the plaintiffs were diligent in their duties.  We

20  think the amounts are modest and well within the range of the

21  awards that courts have made in similar class action

22  litigation.

23         THE COURT:  All right.  Thank you very much.

24         MS. CLARK-WEINTRAUB:  Thank you.

25         THE COURT:  Mr. Reese, do you want to make any

1 record?

2          MR. REESE:  No, Your Honor.  Ms. Weintraub has done an

3 excellent job, in my opinion.

4          THE COURT:  All right.

5          MR. REESE:  Thank you, Your Honor.

6          THE COURT:  And Mr. Garber?

7          MR. GARBER:  No.  I agree with what Mr. Reese just

8 said.

9          THE COURT:  Okay.  Mr. Lonergan, I'm assuming if you

10 want to make any comments in summation, you'll tell me;

11 otherwise, we'll consider the record closed.

12          MR. LONERGAN:  Nothing further from the bank, and

13 we'll submit, Your Honor.

14          THE COURT:  All right.  Well, I want to thank you

15 lawyers for being so well prepared.  We'll consider the matter

16 submitted once I get the requested information from Plaintiffs'

17 counsel.

18          We'll be in recess.

19          MS. CLARK-WEINTRAUB:  Your Honor, just one point of

20 clarification.

21          THE COURT:  Yes.

22          MS. CLARK-WEINTRAUB:  Would you like us to make a

23 formal filing on the issues?

24          THE COURT:  I think that would probably be the best

25 way to handle it.

1          MS. CLARK-WEINTRAUB:  All right.

2          THE COURT:  Thanks very much.

3          MS. CLARK-WEINTRAUB:  Thank you.

4          (Proceedings concluded at 11:56 a.m.)

1       C E R T I F I C A T E

2              I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11             Dated at Des Moines, Iowa, this 4th day of March,

12   2016.

13

14

15                          /s/ Kelli M. Mulcahy
                            Kelli M. Mulcahy, CSR, RMR, CRR
16                          Federal Official Court Reporter

17

18

19

20

21

22

23

24

25